[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

———————

No. 09-12033

———————

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 14, 2010
JOHN LEY
CLERK

D. C. Docket Nos. 03-21266 CV-FAM
00-1334-MD-FAM

AMERICAN DENTAL ASSOCIATION, in an
associational capacity on behalf of its members,
JOHN MILGRAM, DDS,
SCOTT A. TRAPP, DDS, individually and
on behalf of all other similarly situated,
BYRON C. DESBORDES,

Plaintiffs-Appellants,

versus

CIGNA CORPORATION,
CONNECTICUT GENERAL LIFE INSURANCE COMPANY,
CIGNA DENTAL HEALTH, INC., METLIFE, INC.,
METROPOLITAN LIFE INSURANCE COMPANY,
MUTUAL OF OMAHA INSURANCE COMPANY,

Defendants-Appellees.

———————

Appeal from the United States District Court
for the Southern District of Florida

———————

(May 14, 2010)

Before DUBINA, Chief Judge, FAY, Circuit Judge, and ALBRITTON,[*] District Judge.

DUBINA, Chief Judge:

The question presented in this appeal is whether, under Fed. R. Civ. P. 9(b) and the pleading standard recently articulated by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007) and *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937 (2009), Plaintiffs/Appellants ("Plaintiffs") have sufficiently pled factual allegations in their RICO complaint to survive a motion to dismiss. After reviewing the briefs and record and having the benefit of oral argument, we affirm the district court order dismissing the complaint.

## I. BACKGROUND

Plaintiffs are three dentists practicing in Illinois, Nebraska, and Maryland. The American Dental Association ("ADA"), a non-profit dental association headquartered in Chicago, also asserts representational standing on behalf of its members. The defendants/appellees are dental insurance companies: Cigna Corporation, Connecticut General Life Insurance Company, Cigna Dental Health, Inc., MetLife Inc., and Metropolitan Life Insurance Company ("Defendants"). Plaintiffs contracted with Defendants to provide dental services to Defendants'

[*]Honorable W. Harold Albritton, United States District Judge for the Middle District of Alabama, sitting by designation.

members through dental service managed care plans. Plaintiffs now assert violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968 (2006), as well as state law claims for breach of contract and tortious interference with contractual relations and existing and prospective business expectations. More specifically, Plaintiffs allege, on behalf of themselves and a putative class of similarly-situated dentists, that Defendants "engaged in a systematic, fraudulent scheme to diminish payments to Class Plaintiffs through automatic downcoding, Current Dental Terminology ('CDT') code manipulation and improper bundling."[2] D.E. 111, at ¶ 3.

Plaintiffs filed this purported class action lawsuit in the Southern District of Florida in May 2003. The case was originally assigned to Judge Adalberto Jordan.

---

[2]The Council on Dental Benefit Programs created an educational manual to include the *Code on Dental Procedures and Nomenclature* ("the Code"). *Current Dental Terminology, Fifth Edition* ("CDT") contains recent revisions to the Code. The Code, which is designed as the national standard for reporting dental services by the Federal Government under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), is currently recognized by third-party payers, including Defendants, nationwide. An underlying purpose of the Code is to provide a uniform language that accurately describes the dental, surgical and diagnostic services a dental service provider has rendered, thereby giving Defendants or their designated payers the information they need to process a claim for payment. To claim reimbursement for dental services, dental health care providers complete a standardized form incorporating a CDT coding system through which procedures are identified by standardized designations. Plaintiffs allege that Defendants utilized automated programs to manipulate procedure codes on submitted claim forms and thereby reduce the amount paid for dental services. According to Plaintiffs' complaint, "downcoding" reduces or denies payment of claims submitted by dental providers by changing the CDT code assigned to a particular service to a less expensive CDT code. D.E. 111, at ¶ 40. "Bundling" reduces or denies payment of claims by combining the CDT codes of two or more appropriately performed and billed procedures into one CDT code. *Id.* at ¶ 41.

3

Defendants moved to dismiss the RICO and state law claims in the original complaint. On March 30, 2005, Judge Jordan dismissed all of the RICO allegations without prejudice on the ground that Plaintiffs' RICO enterprise allegations were deficient. Plaintiffs filed their first amended complaint on April 18, 2005. On June 30, 2005, while Defendants' motion to dismiss the first amended complaint was pending, Judge Jordan transferred the case to Judge Frederico Moreno as a case related to the *In re Managed Care Litigation* Multi-District Litigation ("*Managed Care* MDL"), 00-MD-1334, an MDL that has been ongoing in the Southern District of Florida since 2000.[3] On November 28, 2005, Judge Moreno designated the case as a tag-along action within the *Managed Care* MDL and closed it for statistical purposes.

In February 2008, Judge Moreno denied all pending motions in the case with leave to re-file, and requested status reports. During the roughly two-year lull in activity in this case, the United States Supreme Court decided *Bell Atlantic*

---

[3]The *Managed Care* MDL was originally limited to claims brought by medical doctors against Humana, Inc., a nationwide managed care organization, and other "major HMOs," *see Klay v. Humana, Inc.*, 382 F.3d 1241, 1249–50 (11th Cir. 2004), but grew to include many disputes between healthcare providers of all kinds (*e.g.*, chiropractors, obstetricians and gynecologists, and dentists) and managed care companies who use computer software programs to process claims. Providers have, among other things, claimed RICO violations, alleging that managed care entities, acting individually and as part of a conspiracy, developed and used certain claims processing, claims payment and/or other practices in order to "deny, delay, and diminish" payments allegedly owed. *See id.* at 1247 & n.1. Among the complained-of practices are "downcoding" and "bundling." *See id.* at 1248.

4

*Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007). Although the district court had not ruled on the motion to dismiss the first amended complaint, Plaintiffs sought and received Defendants' consent to file a motion seeking leave to file a second amended complaint.

On May 1, 2008, Plaintiffs filed their Second Amended Complaint, which is at issue in this appeal. The complaint contains six counts. Counts I-IV are federal RICO and RICO-related claims: RICO conspiracy under 18 U.S.C. § 1962(d) (Count I), a claim for aiding and abetting RICO violations under 18 U.S.C. § 2 (Count II), a substantive RICO claim under 18 U.S.C. § 1962(c) (Count III), and a claim for declaratory relief under 18 U.S.C. § 1964(a) and 28 U.S.C. § 2201 for RICO violations (Count IV). Counts V and VI are state law claims for breach of contract and tortious interference with contractual relations and with existing and prospective business expectancies, respectively.

On June 6, 2008, Defendants moved to dismiss Counts I-IV and VI of the Second Amended Complaint. They did not move to dismiss the breach of contract claim (Count V). After briefing, on February 11, 2009, the district court issued a written order granting the motion to dismiss without prejudice. The court held that all four RICO claims were deficiently alleged. Citing *Twombly*, the court held that Plaintiffs' substantive RICO allegations "fail to set forth a violation of §

5

1962(c) that is 'plausible on its face' because they do not raise a right to relief 'above [the] speculative level.'" *In re Managed Care Litig.*, No. 03-21266-CIV, 2009 WL 347795, at \*4 (S.D. Fla. Feb. 11, 2009) (quoting *Twombly*, 550 U.S. at 570, 555, 127 S. Ct. at 1974, 1965). The court also found the conspiracy claim lacking because the Second Amended Complaint did "not contain sufficient factual allegations about the Defendants agreeing with other entities and/or persons to engage in the ongoing criminal conduct of an enterprise." *Id.* The court held that the remaining RICO claims were deficient for similar reasons.

The district court, however, gave Plaintiffs a chance to file another amended complaint by February 26, 2009. It directed Plaintiffs to "conform with the pleading requirements announced in *Twombly* and applied by this Court in *Solomon* and *Genord*," *id*. at \*7, which are two cases also involved in the *Managed Care* MDL. *See Solomon v. Blue Cross & Blue Shield Ass'n*, 574 F. Supp. 2d 1288 (S.D. Fla. 2008) (dismissing complaint for failure to state a claim under *Twombly*); *Genord v. Blue Cross & Blue Shield of Mich.*, No. 07-21688-CIV, 2008 WL 5070149 (S.D. Fla. Nov. 24, 2008) (same). The court warned that similar failure to comply with the new pleading standard would result in dismissal with prejudice. *In re Managed Care Litig.*, 2009 WL 347795, at \*8.

On February 23, 2009, Plaintiffs sought an extension of time to file a third amended complaint. On February 24, 2009, the district court denied that motion, stating:

> Given the history of this particular case and the consistent insufficiencies of the Plaintiffs' allegations, the Court would likely have had sufficient justification to dismiss Counts I-IV and VI of the Second Amended Complaint *with* prejudice. Because the plaintiffs are operating under newer, more stringent pleading requirements, the Court decided to afford them one last bite at the proverbial apple. . . . At this point, the factual averments necessary to satisfy *Twombly* are either readily included in yet another amended complaint, or simply do not exist.

D.E. 143, at 2. Plaintiffs never filed a third amended complaint. On March 2, 2009, the district court dismissed Counts I-IV and VI with prejudice. The district court entered a final order on March 23, 2009, declining to exercise supplemental jurisdiction over Count V and dismissing the case in its entirety. Plaintiffs now appeal the dismissal of the RICO and RICO-related claims in their complaint.

## II. STANDARD OF REVIEW

"We review *de novo* the district court's grant of a motion to dismiss under Rule 12(b)(6) for failure to state a claim, accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff." *Mills v.*

7

*Foremost Ins. Co.*, 511 F.3d 1300, 1303 (11th Cir. 2008) (quoting *Castro v. Sec'y of Homeland Sec.*, 472 F.3d 1334, 1336 (11th Cir. 2006)).

## III. DISCUSSION

### A. Twombly *and* Iqbal

Because the present case reflects the concerns that motivated the Supreme Court to adopt a new pleading standard in *Twombly* and *Iqbal*, a brief discussion of those decisions is warranted.

Fed. R. Civ. P. 8(a)(2) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 103 (1957). In *Twombly*, the Supreme Court expressly "retired" the "no set of facts" pleading standard under Rule 8(a)(2) that the Court had previously established in *Conley v. Gibson. Twombly*, 550 U.S. at 563, 127 S. Ct. at 1969. Justice Black wrote for the Court in *Conley* of "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S. at 45–46, 78 S. Ct. at 102. In rejecting that language, the Court in *Twombly* noted that courts had read the rule so narrowly and literally that "a wholly conclusory

statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some set of undisclosed facts to support recovery." 550 U.S. at 561, 127 S. Ct. at 1968 (internal quotation marks and alterations omitted).

In *Twombly*, the plaintiffs alleged an antitrust conspiracy among certain regional telecommunications providers in violation of the Sherman Act, 15 U.S.C. § 1 (2006). *Id*. at 550, 127 S. Ct. at 1962. Their complaint relied on allegations of the defendants' parallel behavior to allege the conspiracy. *Id.* The Supreme Court granted certiorari to address the proper standard for pleading an antitrust conspiracy through allegations of parallel conduct. *Id.* at 553, 127 S. Ct. at 1963. Justice Souter, writing for a substantial majority, first noted:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

*Id*. at 555, 127 S. Ct. at 1964–65 (internal quotation marks, citations, and alterations omitted). The Court explained that "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id*. at 555, 127 S. Ct. at 1965. The Court ultimately held that to survive a motion to

9

dismiss, a complaint must now contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 570, 127 S. Ct. at 1974. Cautioning that its new plausibility standard is not akin to a "probability requirement" at the pleading stage, the Court nonetheless held that the standard "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of the claim. *Id.* at 556, 127 S. Ct. at 1965. The Court was careful to note that "we do not require heightened fact pleading of specifics," but concluded that when plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Id.* at 570, 127 S. Ct. at 1974. Finding that the plaintiffs' complaint did not plausibly suggest an illegal conspiracy by merely alleging parallel conduct—because such parallel conduct was more likely explained by lawful, independent market behavior—the Court held that the district court properly dismissed the complaint. *Id.* at 567–70, 127 S. Ct. at 1972–74.

The Supreme Court has since applied the *Twombly* plausibility standard to another civil action, *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009). *Iqbal* involved a *Bivens* action brought by a Muslim Pakistani who had been arrested and detained following the September 11, 2001, terrorist attacks. *Id.* at 1943. He sued current and former federal officials, including John Ashcroft, former Attorney General of

the United States, and Robert Mueller, the Director of the FBI. *Id.* at 1942. Iqbal alleged that Ashcroft and Mueller adopted and implemented a detention policy for persons of high interest after September 11, and that they designated him a person of high interest on account of his race, religion, or national origin, in violation of the First and Fifth Amendments to the Constitution. *Id.* at 1944. Iqbal's complaint alleged that Ashcroft was the "principal architect" of the policy and identified Mueller as "instrumental in [its] adoption, promulgation, and implementation," but also stated that both men "knew of, condoned, and willfully and maliciously agreed to subject" Iqbal to harsh conditions of confinement "as a matter of policy . . . for no legitimate penological interest." *Id.* at 1944 (alteration in original).

In evaluating the sufficiency of Iqbal's complaint in light of *Twombly*'s construction of Rule 8, the Court explained the "working principles" underlying its decision in that case. *Id.* at 1949. First, the Court held that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* Second, restating the plausibility standard, the Court held that "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 1950 (quoting

11

Fed. R. Civ. P. 8(a)(2)). The Court suggested that courts considering motions to dismiss adopt a "two-pronged approach" in applying these principles: 1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* Importantly, the Court held in *Iqbal*, as it had in *Twombly*, that courts may infer from the factual allegations in the complaint "obvious alternative explanation[s]," which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer. *Id.* at 1951–52 (quoting *Twombly*, 550 U.S. at 567, 127 S. Ct. at 1972). Finally, the Court in *Iqbal* explicitly held that the *Twombly* plausibility standard applies to all civil actions, not merely antitrust actions, because it is an interpretation of Rule 8. *Id.* at 1953.

Applying these principles to Iqbal's complaint, the Court began by disregarding as wholly conclusory Iqbal's allegations that Mueller was "instrumental" in adopting the detention policy and Ashcroft was the "principal architect" of the policy, and that they willfully agreed to subject Iqbal to harsh treatment for a discriminatory purpose. *Id.* at 1951. The Court then determined that the remaining factual allegations—that Mueller and Ashcroft approved the FBI's policy of arresting and detaining thousands of Arab Muslim men as part of

12

its investigation into the events of September 11—did not plausibly establish the purposeful, invidious discrimination that Iqbal asked the Court to infer. *Id*. at 1951–52. The alternative inferences that could be drawn from the facts—namely, that the arrests were likely lawful and justified by a nondiscriminatory intent to detain aliens who were illegally present in the United States and who had potential connections to those who committed terrorist acts—were at least equally compelling. *Id.* Accordingly, the Court ruled that Iqbal's complaint must be dismissed. *Id.* at 1954.

With this precedent in mind, we now turn to the RICO allegations in Plaintiffs' Second Amended Complaint.

### B. Plaintiffs' Allegations of the Predicate Acts of a Pattern of Racketeering Activity under 18 U.S.C. § 1962(c)

Section 1962(c) of the RICO statutes requires that a plaintiff prove that a defendant participated in an illegal enterprise "through a pattern of racketeering activity." 18 U.S.C. § 1962(c). "Racketeering activity" is defined to include such predicate acts as mail and wire fraud. 18 U.S.C. § 1961(1). "Mail or wire fraud occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme." *Pelletier v. Zweifel*, 921 F.2d 1465, 1498 (11th Cir. 1989). In order to

prove a pattern of racketeering in a civil or criminal RICO case, a plaintiff must show at least two racketeering predicates that are related, and that they amount to or pose a threat of continued criminal activity. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240, 109 S. Ct. 2893, 2901 (1989). "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *Id.* at 242, 109 S. Ct. at 2902.

Because Plaintiffs' section 1962(c) claim is based on an alleged pattern of racketeering consisting entirely of the predicate acts of mail and wire fraud, their substantive RICO allegations must comply not only with the plausibility criteria articulated in *Twombly* and *Iqbal* but also with Fed. R. Civ. P. 9(b)'s heightened pleading standard, which requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." *See also Ambrosia Coal & Constr. Co. v. Pages Morales*, 482 F.3d 1309, 1316 (11th Cir. 2007) (holding that civil RICO claims, which are "essentially a certain breed of fraud claims, must be pled with an increased level of specificity" under Rule 9(b)). We have held that pursuant to Rule 9(b), a plaintiff must allege: "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these

statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380–81 (11th Cir. 1997) (applying the requirements to a RICO fraud complaint). The plaintiff must allege facts with respect to each defendant's participation in the fraud. *Id.* at 1381.

Plaintiffs' complaint alleges that "[d]efendants represented in their on-line advertising, in their provider agreements and in their fee schedules that their in-network providers would be compensated for covered procedures based on commonly accepted dental practice, standard coding practice and Defendants' fee schedules." D.E. 111, at ¶ 28. Plaintiffs argue that these advertisements, agreements, and fee schedules were fraudulent because they indicated benefits payments lower than what Plaintiffs believed were due to them under their fee-for-service agreements with Defendants, which Plaintiffs argue had promised them timely specified payments "in accordance with standard dental coding procedures." D.E. 111, at ¶ 24. In other words, Plaintiffs contend that they performed multiple procedures worthy of multiple or larger benefits payments, but that Defendants bundled and downcoded the procedures into fewer claims worthy of smaller payments. Additionally, Plaintiffs allege that the *only* way the alleged scheme of downcoding and bundling claims could work is if Defendants

15

"agree[d]" to employ the "same" devices and tactics. D.E. 111, at ¶ 9. Thus, Plaintiffs do not allege parallel schemes among competing dental insurers; they allege a single scheme consisting of identical conduct in which all Defendants agreed to participate. Therefore, not only did Plaintiffs need to plausibly and particularly allege facts showing related instances of mail and wire fraud, but also plausibly allege facts showing that a conspiracy created the alleged scheme.

Though the complaint sets out at least six examples of e-mail and letter communications between Defendants and Plaintiffs, including online advertisements, fee schedules, contracts, and Explanations of Benefits ("EOBs") documents, D.E. 111, at ¶¶ 28–33, 49–56, Plaintiffs do not point to a single specific misrepresentation by Defendants regarding how Plaintiffs would be compensated in any of these communications, nor do they allege the manner in which they were misled by the documents, as they are required to do under Rule 9(b). We have held that a plaintiff must allege that some kind of deceptive conduct occurred in order to plead a RICO violation predicated on mail fraud. *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1065 (11th Cir. 2007) (affirming dismissal of plaintiff's substantive RICO claims where complaint did not allege that defendants made any affirmative misrepresentations in the mailings). Here, Plaintiffs' complaint provides a list of mailings and wires,

16

without ever identifying any actual fraud. If the specific misrepresentations do not exist, it follows that the complaint has not alleged a right to relief that is "plausible on its face." *See Twombly*, 550 U.S. 570, 127 S. Ct. at 1974.

For example, Plaintiffs do not allege any misrepresentations in the EOBs because Plaintiffs allege in their complaint that the EOBs expressly informed Plaintiffs when their claims were going to be bundled or downcoded and gave the reasons for doing so. *See* D.E. 111, at ¶ 56 ("All Defendants have similarly engaged in bundling and downcoding practices by noting on EOBs . . . that 'services are not covered when billed with related primary procedures,' 'benefits are not provided for this service as it is considered to be a part of, and inclusive to, the primary services performed,' or that, 'based on information reported or in file, a different procedure code has been assigned.'"). Plaintiffs have not shown how they were misled by the EOBs if the language in the EOBs notified them about any bundling or downcoding of particular procedures.

Nor does the complaint allege any misrepresentations in the online advertisements. There are no allegations anywhere that the quoted language of the advertisements is false. Read as a whole, they amount at most to puffery, not fraud. *See Byrne v. Nezhat*, 261 F.3d 1075, 1111 (11th Cir. 2001) (noting that claims of surgical success in medical journals "seem more akin to puffing than

17

actionable misrepresentations," in dismissing a civil RICO complaint alleging violations of section 1962(c) predicated on acts of mail fraud). Additionally, Plaintiffs make no allegations as to who, if anyone, read the advertisements and was misled by them.

Further, the complaint does not connect the allegedly fraudulent communications to any particular acts of bundling or downcoding that Plaintiffs find unacceptable. Counsel for Plaintiffs stated at oral argument that this lack of particularity should be excused because they were at an "informational disadvantage" as to exactly how Defendants' software bundled and downcoded submitted procedures. To the contrary, we think it telling that the three named plaintiffs, Drs. Milgram, Trapp, and Desbordes, each received EOBs explaining the reimbursement of specific procedures they had performed, yet the complaint never offers any examples of which claims were bundled and downcoded. Perhaps the closest Plaintiffs come to alleging a specific instance of fraud is in paragraph 49 of the complaint, where they allege that "[d]efendants regularly sent EOBs [to Plaintiffs] that inappropriately and automatically bundled x-ray procedures with other procedures." D.E. 111, at ¶ 49. However, Plaintiffs do not allege other procedures with which the x-ray codes were bundled. This is at most an allegation of possible parallel conduct without any allegation of an agreement

18

as to how Defendants would process x-ray billing codes as part of a greater scheme. In fact, Plaintiffs do not allege how Defendants agreed to employ any of these procedures as part of a long-term criminal enterprise predicated on acts of mail and wire fraud. Simply specifying particular dates and contents of communications cannot automatically constitute a valid claim that a defendant violated 18 U.S.C. § 1962(c) without also plausibly alleging the existence of a long-term criminal enterprise.

In sum, the Second Amended Complaint does not plausibly, under *Twombly*, or particularly, under Rule 9(b), allege a pattern of racketeering activity predicated on a scheme to commit acts of mail and wire fraud. We find no specific misrepresentations in any of the communications Plaintiffs referenced, no connection between the alleged misrepresentations and any particular acts of downcoding or bundling, and no allegations as to how Defendants agreed to engage in an illegal scheme to defraud dental providers. Plaintiffs may have a difference of opinion from Defendants regarding the coding that was used in processing their claims, but we cannot infer a scheme-driven deception from a complaint that provides no details of fraud or conspiracy. Accordingly, we

19

conclude that the district court did not err in dismissing the substantive RICO claim in the Second Amended Complaint for failure to state a claim.[4]

### C. Plaintiffs' Allegations of Conspiracy under 18 U.S.C. § 1962(d)

Section 1962(d) of the RICO statutes makes it illegal for anyone to conspire to violate one of the substantive provisions of RICO, including § 1962(c). 18 U.S.C. § 1962(d). "A plaintiff can establish a RICO conspiracy claim in one of two ways: (1) by showing that the defendant agreed to the overall objective of the conspiracy; or (2) by showing that the defendant agreed to commit two predicate acts." *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 950 (11th Cir. 1997) (quoting *United States v. Church*, 955 F.2d 688, 694 (11th Cir. 1992)). A plaintiff need not offer direct evidence of a RICO agreement; the existence of conspiracy "may be inferred from the conduct of the participants." *Id.* at 950 (quoting *Church*, 955 F.2d at 695).

---

[4]As somewhat of a last resort, Plaintiffs also argue that the district court did not dismiss their substantive RICO claim on the basis that the allegations were insufficiently particularized under Rule 9(b), but that its dismissal was solely grounded on what it held to be a lack of plausibility under *Twombly*. We disagree because the district court referenced Rule 9(b) in the section of its order specifically discussing the section 1962(c) claim. *See In re Managed Care Litig.*, 2009 WL 347795, at *3. But even if the district court did not apply the proper standard to the substantive RICO claim, we need not resolve that issue if there is another basis for affirming its judgment, because "we may affirm its judgment 'on any ground that finds support in the record.'" *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1256 (11th Cir. 2001) (quoting *Jaffke v. Dunham*, 352 U.S. 280, 281, 77 S. Ct. 307, 308 (1957)). The district court's dismissal of the substantive RICO claim is still due to be affirmed because Plaintiffs have not pleaded the claim with sufficient particularity under Rule 9(b).

Here, the allegations in Plaintiffs' complaint do not support an inference of an agreement to the overall objective of the conspiracy or an agreement to commit two predicate acts. In analyzing the conspiracy claim under the plausibility standard, *Iqbal* instructs us that our first task is to eliminate any allegations in Plaintiffs' complaint that are merely legal conclusions. 129 S. Ct. at 1950. Plaintiffs offer conclusory statements such as "[d]efendants have not undertaken the above practices and activities in isolation, but instead have done so as part of a common scheme and conspiracy," D.E. 111 at ¶ 67, and "[e]ach Defendant and member of the conspiracy, with knowledge and intent, agreed to the overall objective of the conspiracy, agreed to commit acts of fraud to relieve Class Plaintiffs of their rightful compensation, and actually committed such acts." D.E. 111, at ¶ 68. These are the kinds of "formulaic recitations" of a conspiracy claim that the Court in *Twombly* and *Iqbal* said were insufficient. *See Twombly*, 550 U.S. at 557, 127 S. Ct. 1966 (noting that "a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality"); *Iqbal*, 129 S. Ct. at 1950–51 (holding that Iqbal's bare allegation that defendants Ashcroft and Mueller agreed to adopt a discriminatory policy was not entitled to the presumption of truth and should be ignored under *Twombly*). Plaintiffs also allege that "[i]n order for the fraudulent schemes described above to be successful,

21

each Defendant and other members of the conspiracy had to agree to enact and utilize the same devices and fraudulent tactics against the Class Plaintiffs." D.E. 111, at ¶ 69. We are "not required to admit as true this unwarranted deduction of fact." *See Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1268 (11th Cir. 2009) (rejecting plaintiff's allegation that the alleged scheme necessarily required the cooperation of the alleged conspirators); *Twombly*, 550 U.S. at 566, 127 S. Ct. at 1971 (rejecting plaintiffs' argument that as soon as one defendant gave in, the conspiracy would not work, because there were logical reasons why defendants would independently engage in similar conduct).

After eliminating the wholly conclusory allegations of conspiracy, we turn to Plaintiffs' remaining factual allegations. Plaintiffs attempt to bolster their conspiracy allegations by describing the following "collective" or parallel actions taken by Defendants, from which they now argue the existence of an agreement may be inferred: the collective development and use of automated processes to manipulate CDT codes, *i.e.* downcoding and bundling; the use of the same claims procedures, including the data that dentists are required to provide in submitting claims, the forms on which dentists must submit their data, and the coding that dentists use to submit their data; and Defendants' participation in trade associations and private, jointly owned partnerships and corporations. D.E. 111,

at ¶¶ 70–71. Assuming for the sake of argument that parallel conduct has actually been alleged here,[5] and accepting these factual allegations as true, as we are required to do under *Iqbal*, *see* 129 S. Ct. at 1950, we think that the Supreme Court's holding in *Twombly* forecloses any possibility that Plaintiffs' allegations of parallel conduct plausibly suggest a conspiracy. The Court stated in *Twombly* that "when allegations of parallel conduct are set out . . . they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." 550 U.S. at 557, 127 S. Ct. at 1966. The Court held that allegations of parallel conduct, accompanied by nothing more than a bare assertion of a conspiracy, do not plausibly suggest a conspiracy, stating that "without that further circumstance pointing to a meeting of

---

[5]We are not convinced that Plaintiffs actually allege parallel conduct with regard to their allegation that Defendants used the same downcoding and bundling methods, because there is no indication from the complaint that Defendants used the same software to downcode and bundle procedures in the same way over an extended period of time. *See* D.E. 111, at ¶ 42 ("To accomplish this downcoding and bundling, Defendants used services and software *such as* those sold and licensed by Dentistat Inc. ('Dentistat') and McKesson Corporation ('McKesson'), *such as* ClaimsCheck Dental, CodeReview, and AutoCoder, *or comparable software*, which, among other things, are capable of modifying code protocols.") (emphases added); D.E. 111, at ¶ 46 ("Through the use of Dentacom, Proclaim *and other systems*, Defendant Cigna aggressively reduces the payment of claims by systematically downcoding, bundling and pending provider claims for payment.") (emphasis added).

23

the minds, an account of a defendant's commercial efforts stays in neutral territory." *Id.*[6]

These conclusions are especially true where, as here, there is an "obvious alternative explanation" for each of the collective actions alleged that suggests lawful, independent conduct. *See Twombly*, 550 U.S. at 568, 127 S. Ct. at 1972 (finding that industry developments provided a "natural explanation" for defendants' alleged conduct that helped to foreclose plaintiffs' suggestion of conspiracy); *Iqbal*, 129 S. Ct. at 1951–52 (finding that though some of the plaintiff's allegations were "consistent with" purposeful discrimination, the complaint as a whole supported a plausible and legitimate motive by law enforcement officers to protect the nation from "suspected terrorists"). As for Plaintiffs' allegation that Defendants downcoded and bundled some submitted claims, insurance companies must use computers and software to efficiently process claims, and the use of downcoding and bundling may be proper in order to decrease physicians' costs and potentially increase profits. *See In re Managed Care Litig.*, 430 F. Supp. 2d 1336, 1348 (S.D. Fla. 2006), *aff'd sub nom. Shane v.*

---

[6]The Court acknowledged that certain examples of a parallel conduct might be sufficient to imply a conspiracy, such as "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." 550 U.S. at 557 n.4, 127 S. Ct. at 1966 n.4 (quoting 6 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 1425, pp. 167–85 (2d ed. 2003)). The conduct alleged here does not fall into any of these categories.

*Humana, Inc.*, 228 F. App'x 927 (11th Cir. 2007) (unpublished). In fact, Plaintiffs' brief only decries the use of "improper" bundling, which implies that some bundling of claims is commonly acceptable. Brief of Appellant at 1. Additionally, the Department of Health and Human Services has taken the position that the inverse processes of "upcoding" and "unbundling" are fraudulent billing practices under Medicare, which supports the use of automated claims processing systems. *See Medicare at Risk: Emerging Fraud in Medicare Programs: Hearing Before the Senate Committee on Governmental Affairs, Permanent Subcommittee on Investigations*, 105th Cong. (1997) (statement of Michael F. Mangano, Principal Deputy Inspector General, U.S. Department of Health and Human Services), *available at* http://www.hhs.gov/asl/testify/t970626b.html. The use of automated systems that bundle and downcode may just as easily have developed from independent action in a competitive environment as it would from an illegal conspiracy, because each insurer would have an economic interest in decreasing physicians' costs and increasing profits. *See In re Managed Care Litig.*, 430 F. Supp. 2d at 1348. The complaint does not plausibly suggest that by using similar methods to downcode and bundle claims, Defendants have acted in any way inconsistent with the independent pursuit of their own economic self-interest. Accordingly, Defendants' parallel conduct is equally indicative of rational

independent action as it is concerted, illegitimate conduct and thus "stays in neutral territory." *See Twombly*, 550 U.S. at 557, 127 S. Ct. at 1966.

As for Plaintiffs' allegation that a conspiracy may be inferred from Defendants' participation in trade associations and other professional groups, it was well-settled before *Twombly* that participation in trade organizations provides no indication of conspiracy. *Twombly*, 550 U.S. at 567 n.12, 127 S. Ct. 1971 n.12; *see also Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 293–94 (5th Cir. 1988) ("A trade association by its nature involves collective action by competitors. Nonetheless, a trade association is not by its nature a 'walking conspiracy' . . . . [T]he establishment and monitoring of trade standards is a legitimate and beneficial function of trade associations.").

Plaintiffs have not plausibly alleged sufficient facts regarding Defendants agreement with other entities or persons to engage in the ongoing criminal conduct of an enterprise. Plaintiffs' allegations of Defendants' parallel conduct, absent a plausibly-alleged "meeting of the minds," fail to "nudge[] their claims across the line from conceivable to plausible." *See Twombly*, 550 U.S. at 557, 570, 127 S.

26

Ct. at 1966, 1974. Accordingly, we conclude that the district court did not err in dismissing the RICO conspiracy claim in the Second Amended Complaint.[7]

## V. CONCLUSION

The RICO allegations in Plaintiffs' Second Amended Complaint "stop[] short of the line between possibility and plausibility." *See Twombly*, 550 U.S. at 557, 127 S. Ct. at 1966. As explained above, Plaintiffs failed to sufficiently plead

---

[7]We recognize that many of our sister circuits have held that if a plaintiff fails to state a claim of a primary RICO violation, then the plaintiff's civil RICO conspiracy claim necessarily fails. *See GE Invest. Private Placement Partners II v. Parker*, 247 F.3d 543, 551 n.2 (4th Cir. 2001); *Efron v. Embassy Suites, P.R., Inc.*, 223 F.3d 12, 21 (1st Cir. 2000); *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir. 1996), vacated on other grounds, 525 U.S. 128, 119 S. Ct. 493 (1998); *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3rd Cir. 1993); *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 367 n.8 (9th Cir. 1992); *Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.*, 941 F.2d 1220, 1232 (D.C. Cir. 1991); *Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 495 (6th Cir. 1990); *In re Edwards*, 872 F.2d 347, 352 (10th Cir. 1989). This court has not expressly stated such a rule. In *Jackson v. Bellsouth Telecomm.*, 372 F.3d 1250 (11th Cir. 2004), we affirmed the dismissal of a RICO conspiracy claim because the complaint failed to allege a substantive RICO claim, but we emphasized that "the RICO conspiracy [claim] add[ed] nothing" because it "simply conclude[d] that the defendants 'conspired and confederated' to commit conduct which in itself does not constitute a RICO violation." *Id.* at 1269. In an unpublished opinion, we characterized our holding in *Jackson* as follows: "where a plaintiff fails to state a RICO claim *and the conspiracy count does not contain additional allegations*, the conspiracy claim necessarily fails." *Rogers v. Nacchio*, 241 F. App'x 602, 609 (11th Cir. 2007) (citing *Jackson*, 372 F.3d at 1269) (emphasis added). Unlike in *Jackson*, Plaintiffs' conspiracy count contains additional allegations, separate from the allegations in the substantive RICO count. Accordingly, there appears to be no controlling authority in our circuit or in the Supreme Court instructing us to adopt the reasoning of our sister circuits and dismiss Plaintiffs' conspiracy claim because the substantive RICO claim was deficiently alleged. *See also Beck v. Prupis*, 529 U.S. 494, 506 n.10, 120 S. Ct. 1608, 1616 n.10 (2000) (expressly declining to resolve whether a plaintiff suing under section 1964(c) for a RICO conspiracy must allege an actionable violation under section 1962(a)–(c)). Because Plaintiffs' conspiracy count fails to state a claim under *Twombly* and *Iqbal*'s plausibility standard, we find it unnecessary to decide in this case whether Plaintiffs' conspiracy claim must also fail because of the deficiencies in the substantive RICO count.

a pattern of racketeering activity predicated on a scheme to commit acts of mail and wire fraud. Plaintiffs also failed to plausibly allege a conspiracy to commit RICO violations, as they merely offered conclusory allegations of agreement accompanied by statements of parallel behavior, which just as easily suggest independent, lawful action. For the aforementioned reasons, we affirm the district court order dismissing Plaintiffs' RICO and RICO-related claims for failure to state a claim.[8]

**AFFIRMED.**

---

[8]The only argument Plaintiffs make with respect to the claim for aiding and abetting RICO violations under 18 U.S.C. § 2 (Count II) is in a footnote, which states that their arguments apply with equal force to that claim. Plaintiffs do not offer any argument with respect to their claim for declaratory relief for RICO violations (Count IV). We conclude that the district court properly dismissed these claims for the same reasons that it dismissed the section 1962(c) and section 1962(d) claims. Additionally, Plaintiffs raise several other arguments on appeal with respect to the district court's order dismissing their complaint. For example, Plaintiffs assert that the district court erroneously found *Twombly* to have created a heightened pleading standard and wrongly compared their RICO allegations to those in the *Solomon* and *Genord* cases that the court had earlier dismissed for failure to state a claim. Because we hold that the Second Amended Complaint fails to state a claim for relief under the plausibility pleading standard articulated by the Supreme Court in *Twombly* and *Iqbal*, we conclude that these contentions are meritless.