[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-11593
Non-Argument Calendar
_____

D.C. Docket No. 4:18-cv-00083-CDL

LEIGH ANN YOUNGBLOOD-WEST,

Plaintiff–Appellant,

versus

AFLAC INCORPORATED,
WILLIAM LAFAYETTE AMOS, JR.,
SAMUEL W. OATES,
DANIEL P. AMOS,
CECIL CHEVES,

Defendants–Appellees.

_____

Appeal from the United States District Court
for the Middle District of Georgia
_____

(December 12, 2019)

Before WILLIAM PRYOR, HULL, and MARCUS, Circuit Judges.

PER CURIAM:

Leigh Ann Youngblood-West appeals the denial of her motion for recusal and the dismissal of her complaint of conspiracy and of racketeering activities in violation of the Racketeer Influenced and Corrupt Organizations Act by Aflac Incorporated, Daniel Amos, Dr. William Amos Jr., Cecil Cheves, and Samuel Oates, 18 U.S.C. § 1962(c), (d). Youngblood-West also appeals the summary judgment in favor of Dr. Amos's counterclaim for breach of contract. After the district court denied Youngblood-West's motion for recusal, it dismissed her complaint as untimely and, in the alternative, implausible, and it ruled that she had violated her two nondisclosure agreements with Dr. Amos and entered a permanent injunction enforcing those agreements. The district court also dismissed Youngblood-West's claims of fraud, intentional infliction of emotional distress, civil conspiracy, and vicarious liability, but she has abandoned, by failing to brief, any challenge she could have made to that adverse ruling. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014). We affirm.

## I. BACKGROUND

In our review of the dismissal of Youngblood-West's complaint, we must accept as true her allegations. *See Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1288 (11th Cir. 2010). But to the extent the "exhibits attached to [her] complaint contradict the general and conclusory allegations of the pleading, the

2

exhibits govern." *Gill as Next Friend of K.C.R. v. Judd*, 941 F.3d 504, 514 (11th Cir. 2019) (internal citation and quotation marks omitted).

In 1984, Dr. Amos allegedly assaulted Youngblood-West while treating her at his private clinic. Youngblood-West's husband worked for Aflac and Dr. Amos was its Chief Medical Director. In 1987, Dr. Amos resigned as medical director and from his position on the board of directors and moved to Florida. In 1989, Aflac forced Youngblood-West's husband to resign.

In 1992, Youngblood-West retained Oates, her employer, to represent her. Oates interviewed Dr. Amos's former office manager and obtained a list of other injured patients from Cheves, Dr. Amos's attorney who was also his brother-in-law. After negotiations, Youngblood-West and her husband accepted $500,000 to release all existing and future "claims, demands, rights, actions . . . or suits at law or in equity of whatever kind," whether "known or unknown, foreseen or unforeseen," founded on any "theory of recovery, . . . in any way growing out of, resulting or to result from the alleged negligent practice of medicine, . . . and specifically for . . . [what occurred on] January 5, 1984." The couple "covenant[ed] that neither they nor their counsel shall reveal to anyone the alleged acts or omissions giving rise to their claims . . . [or] the fact or existence of this release agreement . . . ." They also agreed to the destruction of investigatory materials and medical records. Later, Dr. Stephen Purdom, the new Chief Medical Director of

Aflac, asked Youngblood-West about a videotape Oates possessed, which made her "suspicious that Dr. Purdom was aware of more details of the story."

Youngblood-West's bank learned of her settlement with Dr. Amos. With the assistance of partners in Cheves's law firm, the bank collected from Youngblood-West an outstanding balance on her mortgage. Youngblood-West retained a new attorney to investigate whether the bank received a tip.

In 1993, Youngblood-West entered a settlement with the bank, its lawyers, Cheves, Dr. Amos, and Oates. Youngblood-West and her husband received $75,000 to release existing and future claims "against each and all of the parties," "including, but not limited to[,] fraud, duress, undue influence, breach of fiduciary duty, legal malpractice, unjust enrichment, medical malpractice, mental or emotional suffering, loss of services or consortium." The agreement addressed Youngblood-West's "fee agreement with Mr. Oates" and his failure to "recover enough in his settlement of claims against" Dr. Amos. The agreement also addressed the "legal representation by . . . Cecil Cheves [and his law firm], of or for" Dr. Amos and Youngblood-West's bank and the breach of "any confidentiality agreement or fiduciary duty" owed to her and her husband. Youngblood-West and her husband received an additional $50,000 for their agreement not to disclose "the fact or existence of this release agreement, any of

[its] terms" and "any such matters or any medical or legal services pertaining to any of the parties released . . . ."

In 2016, Youngblood-West met with Dr. Amos. During their conversation, which Youngblood-West recorded, Dr. Amos "guess[ed] Danny [Amos, who assumed the position of Chief Executive Officer of Aflac in 1990,] knew" about the patients' injuries. Dr. Amos stated that he "told Danny when I felt like I needed to resign from the Aflac board . . . because I didn't want to negatively impact anybody else more than I already had." Youngblood-West asked if Dr. Amos would oppose her advocating for a victim organization, and he responded, "that's not my place . . . I trust that you would be careful" and requested that she avoid "see[ing] [his] kids and my grandkids hurt." When Youngblood-West expressed concerns about being "sue[d] . . . [and] in big trouble," Dr. Amos replied, "you know—if you do—and, of course, that's up to you[,] I would hope that you wouldn't use specifics that could . . . trace back. But as far as you advocating . . ., I would have to say that I agree with you . . . .."

In March 2018, Youngblood-West's attorney, Dimitry Joffe, sent a letter to Aflac and Dan Amos that demanded $50 million to suing them for conspiracy and for participating in a criminal enterprise to conceal Dr. Amos's conduct. The letter referenced the 1992 and 1993 agreements. Aflac accused Joffe of extortion and threatened to sue him for libel and harassment.

5

Dr. Amos filed a motion for a temporary restraining order and a complaint that Youngblood-West had breached her nondisclosure agreements. Dr. Amos sought to enjoin Youngblood-West from filing her complaint of racketeering on the public docket. After a hearing, the district court entered a preliminary injunction that required the parties to file their pleadings under seal.

In May 2018, Youngblood-West filed a complaint under seal, which she later amended, that Aflac, Dan Amos, Dr. Amos, Oates, and Cheves conspired to and engaged in racketeering between 1984 and 1987. 18 U.S.C. § 1962(c), (d). She alleged that the defendants used the wires and mails to coerce her to execute "hush agreements," §§ 1341, 1343, 1461–65, obstructed investigations by aiding Dr. Amos's flight to Florida and by destroying evidence, *id.* §§ 1503, 1510, 1511, tampered with witnesses by forcing them to accept "invalid agreements," *id.* § 1512, and retaliated by forcing her husband to resign, disclosing her settlement to her bank, and by threatening her during her meeting with Dr. Amos and in the letter from Aflac and Dan Amos, *id.* § 1513. Youngblood-West alleged eight injuries: she paid Dr. Amos for unnecessary medical procedures; she overpaid Oates for legal services; she was denied her right to honest services from Dr. Amos and Oates; she relinquished two-thirds of her 1992 settlement to the bank and to attorneys; she became indebted after her husband retired; the 1992 and 1993 settlements were "wholly inadequate and unconscionable"; and she suffered from

6

"Defendants' fraud and active concealment." Youngblood-West attached to her complaint copies of her 1992 and 1993 agreements and a transcript of her conversation with Dr. Amos.

The defendants moved to dismiss Youngblood-West's complaint. Fed. R. Civ. P. 12(b)(6). Based on the "common questions of law and fact," the district court consolidated Youngblood-West's action with Dr. Amos's counterclaim. Dr. Amos amended his counterclaim and requested a permanent injunction enforcing the nondisclosure agreements. Youngblood-West then requested additional time for discovery concerning Dr. Amos's assent or capacity to assent to the agreements. Fed. R. Civ. P. 56(d).

Youngblood-West filed a motion for recusal, which the district court denied as "frivolous and . . . just plain misleading." 28 U.S.C. § 455. Youngblood-West identified three grounds for recusal: (1) the district judge participated in a dinner club, referred to as the "Fish House Gang," formed by his great-uncle and the founder of Aflac; (2) the judge was related to William Donald Land Jr., an employee of Aflac; and (3) the judge's wife had worked at Cheves's law firm. The district judge ruled that no appearance of partiality stemmed from his involvement in the supper club "seven years after his great-uncle's affiliation ceased and twenty-eight years after John Amos's affiliation ceased." *See id.* § 455(a). The district judge also ruled that neither sharing an "11th degree of relationship" with

William Land nor his wife's incidental interest in the 1993 agreement as a shareholder in Cheves's law firm required him to recuse. *See id.* § 455(b)(5).

The district court next granted the defendants' motion to dismiss. Fed. R. Civ. P. 12(b)(6). The district court ruled that Youngblood-West's claims of conspiracy and of racketeering activities were barred by the four-year statute of limitation and that she was not entitled to statutory or equitable tolling or equitable estoppel because she "was on notice of her injuries by 1993 at the latest." The district court determined that her recent contact with Dr. Amos and Aflac did not restart the limitations period and that she failed to plead facts plausibly connecting Aflac or Dan Amos to a predicate act or identifying a cognizable injury under the Act. The district court also determined that the nondisclosure agreements were enforceable and survived the alleged fraud of the defendants because Youngblood-West affirmed the agreements by retaining the consideration paid to her.

The district court then denied Youngblood-West's motion for discovery and entered summary judgment in favor of Dr. Amos's counterclaim for breach of contract. The district court ruled that discovery was unnecessary because it could determine the validity of the agreements from the allegations in and attachments to Youngblood-West's complaint. The district court then determined that Dr. Amos was entitled to judgment as a matter of law for Youngblood-West's breach of her

8

nondisclosure agreements and entered a permanent injunction that enforced those agreements.

## II. STANDARDS OF REVIEW

We apply two standards of review in this appeal. We review *de novo* the dismissal of Youngblood-West's complaint and the summary judgment in Dr. Amos's favor. *See McCaleb v. A.O. Smith Corp.*, 200 F.3d 747, 750 (11th Cir. 2000) (statute of limitation and summary judgment); *Chang v. Carnival Corp.*, 839 F.3d 993, 996 (11th Cir. 2016) (equitable tolling); *Bailey v. ERG Enterprises, LP*, 705 F.3d 1311, 1316 (11th Cir. 2013) (equitable estoppel). We review the denial of Youngblood-West's motion for recusal for abuse of discretion. *See Draper v. Reynolds*, 369 F.3d 1270, 1274 (11th Cir. 2004).

## III. DISCUSSION

Youngblood-West makes five arguments for reversal. First, Youngblood-West argues that her claims of racketeering are timely and plausibly allege a pattern of predicate acts. Second, Youngblood-West argues that her nondisclosure agreements are unenforceable. Third, Youngblood-West argues that the permanent injunction violates her right of free speech under the First Amendment. Fourth, Youngblood-West argues that she was entitled to discovery to oppose summary judgment. Fifth, Youngblood-West argues that the district judge should have recused. We address each argument in turn.

9

*A. Youngblood-West's Complaint of Racketeering was Untimely.*

The district court did not err by dismissing as untimely Youngblood-West's complaint. "Civil actions under the Racketeering Influenced and Corrupt Organizations Act . . . are subject to a four-year statute of limitations." *Lehman v. Lucom*, 727 F.3d 1326, 1330 (11th Cir. 2013). That statute commenced running "when [Youngblood-West's] injury was or should have been discovered, regardless of whether or when . . . [she] discovered . . . the injury . . . [was] part of a pattern of racketeering." *See id.* (quoting *Maiz v. Virani*, 253 F.3d 641, 676 (11th Cir. 2001)); *Rotella v. Wood*, 528 U.S. 549, 555 (2000). It matters not that Youngblood-West had an epiphany about the defendants' racketeering in 2016 while talking to Dr. Amos because she had long since known of or could have discovered her injuries. By 1993, Youngblood-West knew that Dr. Amos had injured her and other patients; that Oates and Cheves had worked with Dr. Amos to settle patients' claims; that the three men had revealed the existence of and diminished the proceeds of the 1992 settlement, breached duties owed to her, and defrauded her; that her bank, Cheves, and his law firm had betrayed her trust; and that Aflac knew, at least indirectly, about Dr. Amos's misconduct and his 1992 settlement. Youngblood-West failed to act on the information she possessed and the four-year limitations elapsed long before she filed her complaint in 2018.

Because Youngblood-West's complaint is untimely, we need not address the alternative ruling that her claims were implausible.

Youngblood-West was not entitled to tolling of the limitation period nor to estop the defendants from asserting the limitations period as a defense. Youngblood-West was not entitled to statutory tolling based on Dr. Amos's relocation to Florida, *see* Ga. Code Ann. § 9-3-34, because she knew how to serve him with process after having earlier settled claims against him, *see Andrews v. Stark*, 592 S.E.2d 438, 440 (Ga. Ct. App. 2003). And she failed to exercise due diligence in complaining about the purported pattern of racketeering despite having uncovered the defendants' activities two decades earlier. *See Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 972–73 (11th Cir. 2016) (requiring due diligence by the plaintiff and active deception for equitable tolling). Because Youngblood-West failed to act with due diligence, she also could not invoke the doctrine of equitable estoppel to avoid the statute of limitation. *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194–95 (1997) ("In [the] context [of civil RICO,] . . . a plaintiff who is not reasonably diligent may not assert "fraudulent concealment.").

The district court also did not err by rejecting Youngblood-West's arguments to restart the period of limitation based on the "threats" by Dr. Amos in 2016 "to be 'careful'" not to reveal confidential information and by Aflac and Dan Amos in 2018 to sue Youngblood-West. To reset the period to restart, the

11

defendants had to inflict "a new and independent injury" on Youngblood-West. *See Lehman*, 727 F.3d at 1331. Youngblood-West's alleged injuries are not new.

### B. Youngblood-West's Nondisclosure Agreements Are Enforceable.

Youngblood-West challenges the enforceability of her nondisclosure agreements on four grounds, all of which fail. First, she argues the releases fail to identify counterparties and their obligations. Ga. Code Ann. § 13-1-1. But in the 1992 agreement, Youngblood-West and her husband "released . . . William L. Amos, Jr., M.D., P.C.," "[f]or value received . . . of the sum of . . . ($500,000)," and in the 1993 agreement, "in consideration of payment to them of . . . ($125,000)," the couple gave "a total release and covenant not to sue" "William L. Amos, Jr., . . . the law firm of Samuel W. Oates, Jr. and [him] individually, . . . Cecil M. Cheves individually . . . ." Second, Youngblood-West argues that the releases lacked Dr. Amos's signature. But the doctor signed a signature page to the couple's 1992 agreement that "acknowledg[ed] and confirm[ed] all [their] representations" and "agree[ed] to be bound by . . . said agreement . . . " And the doctor assented to the 1993 agreement by writing the couple a check that they negotiated. *See Burson v. Milton Hall Surgical Assocs., LLC*, 806 S.E.2d 239, 246 (Ga. Ct. App. 2017) ("If one of the parties has not signed, his acceptance is inferred from a performance under the contract, in part or in full . . . ."). Third, Youngblood-West argues the agreements were vitiated by "antecedent fraud,

12

duress and collusion," but after discovering those grounds for rescission, she affirmed the agreements by retaining the settlement payments, *see Kobatake v. E.I. DuPont De Nemours & Co.*, 162 F.3d 619, 625–26 (11th Cir. 1998). Finally, Youngblood-West argues that her agreements violate the public policy of Georgia, but her agreements were valid because they did not forbid her from disclosing unlawful conduct to investigative authorities, *see Camp v. Eichelkraut*, 539 S.E.2d 588, 597–98 (Ga. Ct. App. 2000).

## C. The Enforcement of Youngblood-West's Nondisclosure Agreements Did Not Violate the First Amendment.

The district court did not infringe on Youngblood-West's right of free speech by enforcing her agreements with Dr. Amos. "That 'Congress shall make no law . . . abridging the freedom of speech, or of the press' is a restraint on government action, not that of private persons," *Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 114 (1973), so Youngblood-West was free to waive her right to speech in her private agreements. The enforcement by the district court of Youngblood-West's obligations in those private agreements did not constitute state action. *See United Egg Producers v. Standard Brands, Inc.*, 44 F.3d 940, 943 (11th Cir. 1995). Youngblood-West argues that she acted unintelligently and involuntarily, but she "represent[ed], declare[d], and agree[d]" in the 1992 contract that the "terms [were] fully understood and voluntarily

13

accepted by [her]" and she similarly "acknowledged" in her 1993 agreement that she "fully underst[ood] its contents and meaning."

### D. The District Court Did Not Abuse Its Discretion When It Denied Youngblood-West's Motion to Postpone Summary Judgment to Take Discovery.

The district court acted within its discretion when it denied Youngblood-West's request for discovery. For a nonmovant to obtain time for discovery before responding to a motion for summary judgment, she must "show[] by affidavit or declaration that, for specified reasons, [she] cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). Youngblood-West alleged that Dr. Amos procured the agreements, so he knew about and could understand and accept them. And the agreements Youngblood-West attached to her complaint established that the doctor accepted the 1992 agreement and assented to the 1993 agreement. *See Burson*, 806 S.E.2d at 246. The district court reasonably determined Youngblood-West possessed all facts necessary to respond to Dr. Amos's dispositive motion.

### E. The District Court Did Not Abuse Its Discretion by Denying Youngblood-West's Motion to Recuse.

The district judge did not abuse his discretion in refusing to recuse. No "reasonable person knowing all the facts would conclude that the [district] judge's impartiality might reasonably be questioned." *United States v. Greenough*, 782 F.2d 1556, 1558 (11th Cir. 1986). Youngblood-West's argument for recusal based on the district judge's participation in the Fish House Gang was based, in the

14

words of the district court, "on unsupported, irrational [and] highly tenuous speculation" that he had associated with Dr. Amos, Dan Amos, and Cheves at social events. *See id.* Youngblood-West offered no evidence that the district judge interacted with the defendants. The judge's familial ties to William Donald Land Jr., a "fourth cousin, once removed," is far from the "third degree of relationship" that would be disqualifying. *See* 28 U.S.C. § 455(b)(5). And Youngblood-West identified no "interest [of the district judge's wife] that could be substantially affected by the outcome of the proceeding." *See id.* § 455(b)(5)(iii). She had retired and, when she had been a shareholder in the law firm identified in the 1993 agreement, the Georgia Business Corporation Act limited her liability to her "own acts or conduct" and relieved her of liability for other shareholders' actions. *See* Ga. Code Ann. § 14-2-622(b).

## IV. CONCLUSION

We **AFFIRM** the dismissal of Youngblood-West's complaint and the summary judgment in favor of Dr. Amos on his counterclaim for breach of contract.

15