[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-14126
_____

D.C. Docket No. 1:11-cv-23479-RNS

RICHARD S. LEHMAN,
RICHARD S. LEHMAN, P.A.,
WILSON C. LUCOM TRUST FUND FOUNDATION,

Plaintiffs - Appellants,

versus

HILDA PIZA LUCOM,
MADELAINE ARIAS PIZA, et al.,

Defendants,


MARGARITA ARIAS PIZA,
MELINDA ISABEL ARIAS DE MORRICE,
FRANK MORRICE,
EDNA RAMOS CHUE,

Defendants - Appellees.
_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(August 28, 2013)

Before TJOFLAT and WILSON, Circuit Judges, and PROCTOR,[*] District Judge.

WILSON, Circuit Judge:

Civil actions under the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968, are subject to a four-year statute of limitations. *See Rotella v. Wood*, 528 U.S. 549, 553, 120 S. Ct. 1075, 1080–81 (2000). Under the "separate accrual" rule, "the commission of a separable, new predicate act within a 4-year limitations period permits a plaintiff to recover for the additional damages caused by that act." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190, 117 S. Ct. 1984, 1991 (1997) (discussing, without adopting, the separate accrual rule). In this appeal, we consider whether the allegations in a complaint support the application of the separate accrual rule.

## I.    FACTUAL BACKGROUND

This case arises from what appears to be the best of intentions: an American expatriate's desire to bequeath assets now worth more than $200 million to a foundation established for impoverished children in Panama. Unfortunately, Wilson C. Lucom's good intention has degenerated into years of acrimony between his lawyer and his in-laws.

---

[*] Honorable R. David Proctor, United States District Judge for the Northern District of Alabama, sitting by designation.

2

## A.  Lucom's Will

Lucom married Hilda Piza Lucom (Hilda), a Panamanian, in the 1980s, and they eventually made Panama their permanent home in 1995.  Hilda had previously been married to Gilberto Arias, the former Finance Minister of Panama and a member of one of Panama's most powerful families.  Arias and Hilda had five children together.  By all accounts, Lucom's relationship with the Arias children was nothing short of hostile.  Lucom and Hilda had no children of their own.

Richard Lehman is a Florida attorney who specializes in tax law.  For 31 years, he worked as Lucom's attorney, and the two developed a close personal relationship.  During the last nine months of Lucom's life, Lehman flew regularly to Panama to help Lucom put his estate in order.  According to the complaint, Lucom was a "sensitive soul" with "no natural children of his own," and after seeing firsthand the "needs and hunger endured by thousands of Panamanian children, particularly in the rural areas," he decided to direct most of his fortune to the youth of Panama.  To that end, Lucom's June 20, 2005 will established the "Wilson C. Lucom Trust Fund Foundation" (Foundation).  After providing a $240,000 annuity to Hilda, the will directed significantly smaller bequests to his step-children and other individuals, along with a $1 million bequest to the Mayo Clinic in Rochester, Minnesota.  The rest of the estate, consisting mostly of real property in Panama and the United States, was to be sold with the proceeds placed

3

in the Foundation.  At the time the will was drafted, these assets were valued at $50 million.  The crown jewel of Lucom's estate is the Hacienda Santa Monica, a 7,000 acre ranch that includes 110 acres of beachfront property on the Pacific coast.  The ranch is now worth over $175 million.

The will appointed Lehman, Hilda, and Ruben Chinchorro Carles as the executors, although Chinchorro was later replaced by Christopher Ruddy through a codicil.  According to Lehman, because of a scrivener's error in the drafting of a second codicil, the clause appointing the will's executors was mistakenly stricken.

## B.  Lehman and the Arias Family Fight for Control of the Estate

Lucom passed away on June 2, 2006.  Lehman successfully applied to a Panamanian probate court for appointment as the estate's sole executor, and one month later, he also successfully petitioned a probate court in Palm Beach County, Florida, for ancillary administration of Lucom's will to administer the estate's Florida assets.  In July 2006, Hilda and other members of her family challenged the Panamanian court's order appointing Lehman as the sole executor.  Their efforts—along with bribes, corruption, and perjury, according to Lehman—quickly led to Lehman's suspension as executor of the estate that August.  Because Lehman had not been removed as the executor, he began spending his own money, millions of dollars he says, to protect the estate.  The Panamanian proceedings culminated in

4

an August 6, 2010 ruling by the Supreme Court of Panama declaring Hilda the sole executor of the estate and its "universal heir."

Two months after the August 2006 suspension order by the Panamanian probate court, Hilda and her children[1] also mounted a challenge to the Florida probate court's order through a surcharge action in the same court. The surcharge action ended on March 3, 2009, after a three-day trial, with a judgment against Lehman for $1,013,547.05.  The probate court found that Lehman had breached his fiduciary duty to the estate by comingling funds, writing:

> Although Lehman attempted to portray himself at trial as a protector of the assets of the overall estate, the credible evidence showed him to be a covetous opportunist using the ancillary estate assets to thwart the Orders of the Panama Court in the domiciliary estate, seeking personal advantage and control of the assets in the $25–50 million domiciliary estate.

During the pendency of these litigations, in September 2006, the Arias Group filed a variety of false criminal charges (known as *denuncias*) against Lehman with the Panamanian police, and attempted to bribe and extort Lehman. Lehman alleges a variety of injuries stemming from the false *denuncias*.  In addition to notifying the Panamanian and American courts about the *denuncias*, in December 2007 the Arias group published several newspaper articles concerning the *denuncias*.  Lehman also alleges that the Arias Group filed a complaint with the

---

[1] Hilda passed away on August 24, 2011.  For ease of analysis, we will refer to the remaining Appellees, three members of the Arias family and one of their lawyers, as the "Arias Group."

5

Panamanian criminal courts, citing the *denuncias*, to shut down his personal and professional web sites.  And finally, the Arias Group used the *denuncias* to "illegally black-list" Lehman by placing him on "Red Notice Alert" with Interpol.[2] To prevent this "onslaught," on January 11, 2007, Lehman filed a complaint in Palm Beach County against the Arias Group and its lawyers, alleging abuse of process and civil conspiracy.  The action was dismissed in December 2009.

## II.  PROCEDURAL BACKGROUND

Lehman[3] brought this complaint against the Arias Group on September 23, 2011.  Several members of the Arias Group filed motions to dismiss the complaint, which the trial court converted into motions for summary judgment.  In the motions for summary judgment, the Arias Group argued that: (1) Lehman sought an inappropriate extraterritorial application of RICO; (2) Lehman had not pleaded a cause of action or established standing for RICO; (3) Lehman lacked the capacity to sue on behalf of the estate; and (4) Lehman's RICO claims were barred by the statute of limitations.  The district court granted summary judgment in favor of the

---

[2] Interpol is the common name of the International Criminal Police Organization, a 190-country intergovernmental organization that facilitates "international police cooperation." *Overview*, Interpol, http://www.interpol.int/About-INTERPOL/Overview (last visited Aug. 26, 2013).

[3] The Appellants in this case are Richard S. Lehman, individually and as the Executor of the Wilson C. Lucom Estate, Richard S. Lehman, P.A., and the Wilson C. Lucom Trust Fund Foundation (Lehman is the only trustee of the Foundation).  Because all of the Appellants are different representations of Lehman, this opinion will refer to the Appellants collectively as "Lehman."

Arias Group after determining that Lehman's RICO claims were barred by RICO's four-year statute of limitations. Agreeing with the Arias Group, the court wrote that Lehman was "aware of injuries flowing from [the Arias Group's] alleged enterprise at least as early as January 2007." Because Lehman brought the action in September 2011—more than four years after his awareness of the alleged RICO injuries—the district court dismissed the complaint. Lehman now argues that under the separate accrual rule, his civil RICO claim was timely.

### III.  ANALYSIS

We review grants of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party. *Miller's Ale House v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1316 (11th Cir. 2012).

Under RICO, it is illegal "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Four elements must be proven in a RICO case: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1282 (11th Cir. 2006) (per curiam) (internal quotation marks omitted). "A pattern is established by at least two acts of racketeering activity the last of which occurred within ten years . . . after the commission of a

7

prior act of racketeering activity." *McCaleb v. A.O. Smith Corp.*, 200 F.3d 747, 750 (11th Cir. 2000) (alteration and internal quotation marks omitted). The civil RICO provision permits a private plaintiff "injured in his business or property by reason of a violation of section 1962" to recover treble damages. § 1964(c).

"The statute of limitations for civil RICO actions is four years." *McCaleb*, 200 F.3d at 751. The action begins to run "when the injury was or should have been discovered, regardless of whether or when the injury is discovered to be part of a pattern of racketeering." *Maiz v. Virani*, 253 F.3d 641, 676 (11th Cir. 2001) (citing *Rotella v. Wood*, 528 U.S. 549, 555, 120 S. Ct. 1075, 1080 (2000)).

Our separate accrual rule in civil RICO actions derives from the accrual rule under the Clayton Antitrust Act of 1914, Pub. L. 63-212, 38 Stat. 730 (codified as amended at 15 U.S.C. §§ 12–27 and 29 U.S.C. §§ 52–53). As the Supreme Court has observed, "Congress consciously patterned civil RICO after the Clayton Act." *Klehr*, 521 U.S. at 190, 117 S. Ct. at 1990. The rule provides that if a new RICO predicate act gives rise to a new and independent injury, the statute of limitations clock will start over for the damages caused by the new act. *See Klehr*, 521 U.S. at 190, 117 S. Ct. at 1991. At the same time—in keeping with the Clayton Act accrual rule—the "plaintiff cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period." *Id.*; *Bivens Gardens Office Bldg., Inc. v.*

8

*Barnett Bank of Fla., Inc.*, 906 F.2d 1546, 1552 n.9 (11th Cir. 1990), *abrogated on other grounds by Rothella v. Wood*, 528 U.S. 549, 555, 120 S. Ct. 1075, 1080–81 (2000).  By extension, when an injury is a "continuation of [an] initial injury," it "is not *new and independent*."  *Pilkington v. United Airlines*, 112 F.3d 1532, 1537–38 (11th Cir. 1997) (emphasis in original).

We announced our adoption of the separate accrual rule in *Bivens*, where we held that the mismanagement of a partnership's assets and the sale of the partnership's primary asset, a hotel, were new and independent injuries from an earlier wrongful takeover of the partnership.  906 F.2d at 1549–51.  We reasoned that the mismanagement of assets and the sale of the hotel were "not included among the injuries that naturally flow from the wrongful takeover."  *Id.* at 1551.

Later, in *Pilkington*, we quoted with approval the Ninth Circuit's articulation of the appropriate circumstances for the rule: "'1) It must be a new and independent act that is not merely a reaffirmation of a previous act; and 2) It must inflict new and accumulating injury on the plaintiff.'"  112 F.3d at 1537 (emphasis omitted) (quoting *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238 (9th Cir. 1987)).  In *Pilkington*, the plaintiffs, who alleged a pattern of racketeering activity based on post-strike harassment by United Airlines, contended that "each act of harassment account[ed] for a new and independent injury."  *Id.* at 1536.  We disagreed, because although each act of harassment had an "adverse impact" on the

9

plaintiffs, the injury was not new and independent. *Id.* at 1537–38. Instead, they were "recharacterizations and continuations of the same injuries" that occurred earlier. *Id.* at 1538.

We also endorsed the Ninth Circuit's reasoning in *Grimmett v. Brown*, 75 F.3d 506, 508 (9th Cir. 1996), where a civil RICO plaintiff alleged that her ex-husband's attorney "masterminded the reorganization of [the ex-husband's] medical practices so as to cheat [the plaintiff] out of her post-divorce community property interest in those practices." *See Pilkington*, 112 F.3d at 1537 (citing favorably the analysis in *Grimmett*). The complaint was dismissed as untimely because the injury was "perfected upon the reorganization of the medical practices and the filing of [the ex-husband's] bankruptcy petition," which occurred more than four years before the filing of the plaintiff's complaint. *Grimmett*, 75 F.3d at 513–14. The Ninth Circuit rejected the plaintiff's argument that "new and independent" acts occurred during the bankruptcy proceeding. *Id.* at 514. Some of the acts included submitting false documents to the bankruptcy court, falsely testifying to the bankruptcy court, and concealing documents from the bankruptcy court. *Id.* These acts were "part of the same corporate reorganization/bankruptcy scheme," and were "far less independent from one another than were the wrongful takeover and mismanagement of assets in *Bivens*." *Id.*

In the case before us, the district court found that Lehman was aware of all the alleged RICO injuries more than four years before the September 23, 2011 filing date of his complaint.  Comparing the allegations of Lehman's January 2007 abuse of process complaint and his September 2011 civil RICO complaint, the court observed that the two documents were "strikingly similar."  For example, the January 2007 complaint alleged that the Arias Group

> set up a plan that is continuing today to abuse the judicial process of the Courts of both Panama and the United States in an attempt to intimidate, bribe and extort Lehman to coerce him to resign in favor of Hilda as the Executor in Panama and as Lucom's Personal Representative in Florida.

Likewise, the September 23, 2011 RICO complaint alleged that

> [t]he criminal conspiracy had one objective: thwart [Lehman] through acts of intimidation[,] extortion, corruption, theft, money laundering, and bribery of foreign officials, so that the [Arias Group] could steal the Estate assets for themselves.

After considering both complaints, we agree with the district court that Lehman has done little more than repackage his 2007 abuse of process complaint. We cannot accept Lehman's argument that his only pre-September 2007 injury— which he claims is a non-RICO injury at that—was his expenditure of attorney's fees on behalf of the estate.  Like the RICO complaint, the abuse of process complaint alleged that the Arias Group was "using [its] political influence in Panama to access Estate assets, dissipate the assets before they are probated, and thereby attempt to totally deplete the Estate before its assets can be probated."

11

Specifically, Lehman complained that the Arias Group was "attempting to sell Hacienda Santa Monica and benefit from the sale proceeds." The 2007 complaint also recounted the *denuncias* filed against Lehman in Panama. It goes without saying that any additional injuries stemming from those acts in the 2011 complaint would be untimely, and in fact most of Lehman's injuries in the 2011 complaint might as well be cut-and-pasted from the 2007 action.

Lehman cannot avoid that reality by cherrypicking dates. For instance, his RICO complaint alleges that in March 2011 the Arias Group "directed and/or conspired . . . to sign off on, and transfer tracts of [the] Lucom Estate's Hacienda ranch to third party transferees." This is, of course, by no means "new" or "independent" from the 2007 allegation that the Arias Group was "attempting to sell Hacienda Santa Monica." The list goes on. The 2011 complaint alleges that the Arias Group initiated "baseless, improperly motivated sham litigation in Panama"; the 2007 complaint alleged "false and baseless criminal charges against Lehman in Panama." The 2011 complaint alleges that the Arias Group introduced the "baseless" Panamanian criminal charges in the Florida Probate Court; the 2007 complaint alleged that the Arias Group "inform[ed] the Florida probate court of [the] false charges." The 2011 complaint alleges that the Arias Group caused Lehman to incur "attorneys' fees and costs to defend itself"; the 2007 complaint alleged that the Arias Group had caused "the expenditure of funds . . . to defend

12

against the unsubstantiated and false criminal charges and civil action." The 2011 complaint alleges that the Arias Group engaged in a "conspiracy to steal the assets of Lucom's largest Estate Asset in Florida—Valores"; the 2007 complaint alleged that the Arias Group was "wrongfully attempting to take control of Valores."

In short, any claim by Lehman that he was not aware of his injuries before September 23, 2007—four years prior to the RICO complaint—cannot be substantiated. We agree with the district court that Lehman knew, or should have known, of most of the injuries that justify the allegations in the complaint prior to September 2007. That is to say, all of the injuries complained of by Lehman are "merely . . . continuations of the same injuries previously alleged." *Pilkington*, 112 F.3d at 1538. In light of the 2007 complaint, Lehman's contention that his only pre-September 2007 injury was the expenditure of attorney's fees does not hold water.[4]

Even if all of this is true, Lehman points out, there were other new and independent post-September 2007 injuries: (1) an October 24, 2007 Interpol Red Notice Alert that stemmed from the Arias Group's *denuncias*; (2) the Arias Group's dissemination of damaging information about Lehman in newspapers in

---

[4] We confess that we are unable to grasp Lehman's argument that his expenditure of attorney's fees on behalf of the estate both *is* and *is not* a RICO injury. On page 52 of his brief, he argues that no RICO injuries existed prior to September 2007 because "[t]he expenditure of attorney's fees, without more, is not a cognizable RICO injury." How, then, only six pages earlier, can Lehman complain of a RICO injury when he "expended more than one million dollars ($1,000,000) of his own money in his efforts to defend Mr. Lucom's assets in Panama"?

13

December 2007; (3) the shutting down of Lehman's websites on February 27, 2009; and finally (4) the harm to Lehman's business reputation on March 3, 2009, when the Florida probate court called him a "covetous opportunist."

Yet all of these injuries fail for the same reason that Lehman's earlier injuries failed: they are merely "reaffirmation[s] of a previous act." *Pilkington*, 112 F.3d at 1537. The Red Notice Alert, the newspaper articles, and the shutting down of his websites were all injuries that arose from the *denuncias* filed against him in September 2006. As we have said before, a "continuation of damages into a later period will not serve to extend the statute of limitations for a RICO action." *Id.* As for name-calling by a Florida probate court, that injury, as Lehman admits in his complaint, came from the introduction of what he refers to as "corrupt Panamanian orders" into the Florida judicial proceedings. As the record makes clear, the alleged "corrupt orders" began when Hilda challenged Lehman's appointment as executor in August 2006. Again, Lehman labors to recharacterize a continuation of damages as a new and independent act, but *Pilkington* made clear that a civil RICO plaintiff may not do so. *See id.* Like the plaintiff in *Grimmett* who attempted to cleave the bankruptcy proceedings into separate acts for purposes of timeliness, *see* 75 F.3d at 514, Lehman isolates different points in time during the Panamanian proceedings in an attempt to salvage his claim. But Lehman cannot make a silk purse out of a sow's ear—he cannot make timely what is

14

untimely and elude the staleness of his injuries, because it is readily apparent that he was aware of the Arias Group's activities four years before he filed his RICO complaint.

## IV. CONCLUSION

It bears mentioning that Lehman's complaint at times reads like a petition for certiorari to the Panama Supreme Court.  It is true that the record before us leaves some questions about what Lucom's will actually said, and we may never know for sure the intended executors or beneficiaries of his will.  If Lehman is taken at his word, it is indeed unfortunate that the disadvantaged youth of Panama will not benefit from the generosity of the late Mr. Lucom.  Yet we are not a Panamanian probate court, nor are we vested with appellate jurisdiction to consider appeals from Panamanian courts.

We conclude that none of the injuries in Lehman's complaint are new and independent because all of his alleged injuries are continuations of injuries that have been accumulating since before September 2007.  Therefore, Lehman's civil RICO complaint was untimely, and the district court did not err when it granted summary judgment in favor of the Arias Group.

**AFFIRMED.**

15