[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-11959
_____

D.C. Docket No. 1:13-cv-23998-CMA

DONALD KIPNIS,
LAWRENCE KIBLER,
BARRY E. MUKAMAL
As Chapter 7 Trustee of the Estate of Donald Kipnis,
KENNETH A. WELT
As Chapter 7 Trustee of the Estate of Lawrence Kibler,

Plaintiffs-Appellants,

versus

BAYERISCHE HYPO-UND VEREINSBANK, AG,
a corporation,
a.k.a. Unicredit Bank AG,
HVB U.S. FINANCE, INC.,
a.k.a. Unicredit U.S. Finance, Inc.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(April 17, 2015)

Before HULL, BLACK and MELLOY,[*] Circuit Judges.

PER CURIAM:

In this diversity case, plaintiffs-appellants Donald Kipnis and Lawrence Kibler (collectively, "Plaintiffs"), along with plaintiffs-appellants Barry Mukamal and Kenneth Welt,[1] appeal the district court's Federal Rule of Civil Procedure 12(b)(6) dismissal of their complaint against defendants-appellees Bayerische Hypo-Und Vereinsbank, AG and HVB U.S. Finance, Inc. (collectively, "HVB") as barred by the applicable statutes of limitations. After review and oral argument, we certify a question to the Florida Supreme Court as outlined below.

## I.  BACKGROUND

This appeal arises out of the parties' participation in an income tax shelter scheme known as a Custom Adjustable Rate Debt Structure ("CARDS") transaction. In short, Plaintiffs alleged that HVB and its co-conspirators defrauded Plaintiffs by promoting and selling CARDS for their own financial gain.

**A.    2001 Introduction to CARDS**

---

[*]Honorable Michael J. Melloy, United States Circuit Judge for the Eighth Circuit, sitting by designation.

[1]On January 21, 2014, Kipnis filed a Chapter 13 bankruptcy petition, which he converted to a Chapter 7 case on February 6, 2014. On May 1, 2014, the district court granted Barry Mukamal's motion, as the Chapter 7 Trustee, to be substituted for Kipnis in the action. Kibler filed a Chapter 7 bankruptcy petition on January 13, 2015. On March 20, 2015, this Court granted Kenneth Welt's motion, as the Chapter 7 Trustee, to be substituted for Kibler in the action.

Plaintiffs are owners of Miller & Solomon General Contractors, Inc. ("M&S"), one of the largest general contractors in south Florida. In 1999, M&S lost over $3 million, which substantially reduced its working capital just as south Florida was entering a construction boom. Plaintiffs sought to increase M&S's bonding capacity in anticipation of the construction boom, but were unable to secure the desired long-term financing from conventional bank sources.

Michael DeSiato was both Plaintiffs' and M&S's accountant. In 2000, DeSiato was introduced to Roy Hahn of Chenery Associates, Inc. ("Chenery"), a financial and tax services boutique that developed and promoted CARDS transactions. DeSiato told Plaintiffs that CARDS was the type of financing that could increase M&S's bonding capacity and provide tax benefits that would flow to Plaintiffs. Starting in 2000, Chenery and HVB marketed the CARDS strategy to Plaintiffs.

Plaintiffs analyzed CARDS to determine whether implementing the strategy would allow M&S to participate in more construction projects. However, Plaintiffs did not examine the various steps in a CARDS transaction and neither Plaintiffs nor DeSiato fully understood the complicated procedures involved. Instead, Plaintiffs relied on the reputations of HVB and Sidley Brown & Wood LLP ("Sidley"), a law firm that had prepared an opinion letter representing CARDS as an economically substantive strategy that would pass IRS scrutiny.

**B.      CARDS Transactions, Generally**

CARDS transactions are designed to create the appearance of a tax loss without any actual economic loss.  A CARDS transaction has three steps.

In the first step, a Delaware limited liability company ("LLC") is formed to serve as the borrower.  The borrower LLC is comprised entirely of foreign members to avoid being subject to U.S. taxation.  Once formed, the borrower LLC obtains a euro-denominated loan from an international bank.  The borrower LLC then purchases two certificates of deposit ("CDs") from the lending bank—one with 85% of the loan proceeds and the other with 15% of the loan proceeds.  The loan proceeds, in the form of the two CDs, are immediately pledged to the lending bank as collateral for the loan.

In the second step, the CARDS customer buys the smaller, 15% CD from the borrower LLC.  In exchange, the CARDS customer assumes joint and several liability for the full value of the loan and agrees to pay 100% of the loan principal when the loan reaches its maturation date.  In the third step, the CARDS customer converts the 15% euro-denominated CD into U.S. dollars, which the customer then gives back to the lending bank as collateral for the loan.  In the absence of other acceptable collateral, the money never leaves the custody and control of the lending bank.

4

This currency exchange is a taxable event generating tax benefits. To achieve the benefits, the CARDS customer claims that his cost basis in the exchanged currency is the entire loan amount—not just the 15% portion he actually received from the borrower LLC. This discrepancy creates a tax loss of 85% of the original loan amount, which is used to offset ordinary income. However, because both the 85% and 15% CDs are held by the lending bank and are used to repay the loan, the paper loss created by the currency exchange is illusory.

## C.    Plaintiffs' CARDS Transaction: December 2000–December 2001

Plaintiffs' CARDS transaction, which commenced on December 5, 2000, and terminated on December 5, 2001, worked as follows. HVB, a large German bank, served as the lender. Wimbledon Financial Trading LLC ("Wimbledon"), formed on October 11, 2000, by two United Kingdom citizens, served as the borrower.

On December 5, 2000, Wimbledon entered into a credit agreement with HVB, in which HVB agreed to lend Wimbledon €6,700,000 over a 30-year term with interest. On the same day, Wimbledon requested that HVB transfer the €6,700,000 to Wimbledon's HVB account. Wimbledon issued a promissory note to HVB for €6,700,000, maturing on December 5, 2030, and HVB credited Wimbledon the same amount. Wimbledon then pledged all of its holdings at HVB

5

as collateral.  Also on December 5, 2000, Wimbledon purchased an HVB time deposit in the amount of €5,679,792, maturing on December 5, 2001.

On December 21, 2000, Wimbledon and Plaintiffs entered into a purchase agreement and an assumption agreement.  Under the purchase agreement, "Wimbledon sold each Plaintiff a portion of the [loan] in the form of a term deposit in the amount of €520,500 (for a total of [€]1,005,000), plus accrued interest, held in Wimbledon's pledged HVB account."  The term deposits, which amounted to 15% of the €6,700,000 loan, were transferred to Plaintiffs' HVB account on December 27, 2000.  As part of the purchase agreement, Plaintiffs assumed joint and several liability "for all obligations under the [credit agreement] not covered by Wimbledon's collateral."

Under the assumption agreement, Plaintiffs assumed joint and several liability for Wimbledon's obligations, including repayment of the entire €6,700,000 loan.  As collateral, Plaintiffs pledged all of their right, title, and interest in the accounts and instruments they held with HVB, as well as all proceeds thereof.

With these agreements in place, Wimbledon, HVB, and Plaintiffs took the following steps to execute the assumption of the loan.  On December 21, 2000, Plaintiffs wired HVB a total of $1,198,000 to buy three time deposits maturing on December 5, 2001.  On December 27, 2000, HVB transferred the €1,005,000

6

referenced in the purchase agreement between Plaintiffs and Wimbledon into Plaintiffs' HVB account.  Also on December 27, 2000, HVB exchanged €733,750 of the €1,005,000 it had credited to Plaintiffs for $682,387.50, at a rate of 0.93 U.S. dollars to the euro.  On January 11, 2001, HVB exchanged the remaining €271,250 for $256,331.25, at a rate of 0.945 U.S. dollars to the euro.

After Plaintiffs deposited $1,198,000 with HVB, HVB allowed M&S to withdraw $1,037,680 of the loan proceeds to use as it wished.  On January 11, 2001, Plaintiffs began using the withdrawn loan proceeds.  Specifically, Plaintiffs wired (1) $382,000 in fees from their HVB account to an account held by Chenery (as the promoter of the CARDS transaction)[2] and (2) $556,718.75 to M&S's account at Mellon Bank.

On November 13, 2001, less than one year after initiation of the CARDS transaction, HVB informed Plaintiffs that full repayment of the loan was due on December 5, 2001.  HVB did so despite its prior representations that it would maintain the loan for 30 years.  On December 5, 2001, the mandatory repayment date, Plaintiffs' deposits at HVB were converted to the euro at the December 22, 2000 exchange rate.  Had the December 5, 2001 exchange rate been applied instead, Plaintiffs would have made a profit of $70,200 from the currency

---

[2]Plaintiffs' complaint fails to allege or approximate the dates that they paid the fees to the CARDS Dealers, other than the wire transfer to Chenery on January 11, 2001.  As the district court pointed out, however, all fees would necessarily have been paid no later than the termination of the CARDS transaction on December 5, 2001.

7

exchange.  Plaintiffs' CARDS transaction closed on December 5, 2001, once all of the borrowed money was repaid with the pledged collateral.

## D.    HVB Publicly Admits Fault: February 2006

CARDS transactions and their providers, such as HVB, have been the subject of investigation by federal authorities.[3]  As a result of its involvement in CARDS, HVB was charged with participating in a conspiracy to defraud the United States, to commit tax evasion, and to make false and fraudulent tax returns.

On February 13, 2006, HVB entered into a deferred prosecution agreement ("DPA") with the U.S. Department of Justice.  HVB admitted that, between 1996 and 2003, it assisted tax evasion by U.S. citizens by participating in and implementing fraudulent tax shelter transactions, including CARDS.  HVB acknowledged that "the documentation used to implement CARDS . . . falsely stated that the loans were 30-year loans whereas, in truth and fact, as HVB and other participants knew and understood, they were loans of approximately one year in duration."  HVB admitted that "CARDS transactions . . . involved false representations" and "had no purpose other than generating tax benefits for the clients involved."

[3]The Internal Revenue Service ("IRS") has issued several notices concerning CARDS transactions.  In March 2002, the IRS issued a notice warning taxpayers against claiming tax benefits through CARDS shelters, because such benefits would be subject to penalties.  See I.R.S. Notice 2002-21, 2002-1 C.B. 730.  On October 28, 2005, the IRS offered a settlement initiative whereby taxpayers could pay a reduced penalty by relinquishing their CARDS-related tax benefits.  See I.R.S. Announcement 2005-08, 2005-2 C.B. 967.  Plaintiffs did not allege they participated in this 2005 settlement initiative.

As part of the DPA, HVB agreed to pay the United States $29,635,125, which included disgorgement of $16,195,999 in fees HVB had collected from its tax shelter activities, restitution to the IRS, and civil penalties.  Given HVB's admissions in the 2006 DPA, the CARDS strategy could never have withstood IRS scrutiny.

## E.    2007 Notices of Deficiency and Tax Court Petitions

On October 4, 2007, the IRS issued notices of deficiency to Plaintiffs.  The IRS informed Plaintiffs that the CARDS transaction they had engaged in lacked economic substance and that the tax benefits they had claimed on their 2000 and 2001 federal tax returns were being disallowed.  Specifically, the IRS assessed tax deficiencies against (1) Kipnis of $650,914 for 2000 and $346,495 for 2001 and (2) Kibler of $629,361 for 2000 and $351,973 for 2001.

On December 31, 2007, Plaintiffs filed petitions in the tax court, challenging the IRS's deficiency determination.  Plaintiffs argued to the tax court that they entered into the CARDS transaction primarily for nontax reasons, namely, to obtain funds to transfer to their contractor company M&S to increase M&S's bonding capacity.

The tax court denied the IRS summary judgment based on a dispute of material fact as to whether Plaintiffs had a nontax business purpose for the CARDS transaction.

9

**F.    November 2012 Tax Court Decision**

On November 1, 2012, following a three-day trial, the U.S. tax court issued a decision in favor of the IRS.  See Kipnis & Kibler v. Comm'r, 104 T.C.M. (CCH) 530 (2012).  The tax court concluded, inter alia, that Plaintiffs' CARDS transaction "lacked economic substance" and that Plaintiffs "did not have a business purpose for entering into" it.  Id.

**G.    November 2013 Complaint**

On November 4, 2013, nearly 12 years after defendant HVB terminated their CARDS transaction on December 5, 2001, Plaintiffs filed a diversity complaint against HVB in the U.S. District Court for the Southern District of Florida.

The complaint raised seven claims arising out of defendant HVB's participation in Plaintiffs' CARDS transaction: violation of the Florida Civil Racketeer Influenced and Corrupt Organization ("RICO") statute (Count 1), common law fraud (Count 2), aiding and abetting Sidley's and Chenery's fraud (Count 3), conspiracy to commit fraud (Count 4), breach of fiduciary duty (Count 5), aiding and abetting Sidley's and Chenery's breaches of fiduciary duty (Count 6), and negligent supervision of employees and executives (Count 7).

Plaintiffs alleged that defendant HVB and its employees conspired with Chenery, Sidley, and other individuals and entities (collectively, "CARDS Dealers") to perpetuate a fraudulent tax shelter scheme on thousands of their

clients, including Plaintiffs.  According to Plaintiffs, HVB knew that the scheme would not withstand IRS scrutiny and that CARDS transactions were "nothing more than illegal tax shelters" that Chenery and HVB "developed and implemented . . . for the sole purpose of generating unconscionable fees."  Plaintiffs contended that they were fraudulently induced to enter the CARDS transaction and did so in reliance on the reputations of the CARDS Dealers involved, including HVB.

Defendant HVB allegedly "owed Plaintiffs fiduciary duties by virtue of [its] role as Plaintiffs' lender, its superior knowledge of the CARDS transaction, the control HVB retained over Plaintiffs' accounts . . . and the trust and confidence that . . . Plaintiffs reposed in HVB."  HVB purportedly breached these fiduciary duties by concealing material information, committing fraud, and advising Plaintiffs to enter into the CARDS transaction.  According to Plaintiffs, HVB made several misrepresentations, including that it intended to maintain the loans for 30 years.

Plaintiffs "paid a heavy price in damages" as a result of HVB's wrongdoing, including "substantial fees (and interest payments)" they paid HVB and other CARDS Dealers to participate in the CARDS strategy and "hundreds of thousands of dollars in 'clean-up' costs" they incurred after HVB failed to advise them to amend their tax returns.

11

Consequently, Plaintiffs sought to recover the "damages that reasonably flow" from HVB's misconduct. These damages included fees they paid to HVB and other CARDS Dealers, attorney's fees and accountant's fees incurred in litigating against the IRS, back taxes and interest paid by Plaintiffs, punitive damages, treble damages, and attorney's fees and costs incurred in the instant action.

## H.    Dismissal of Complaint

On January 10, 2014, defendant HVB moved to dismiss the complaint, pursuant to Rule 12(b)(6). HVB argued that all of Plaintiffs' claims were barred by Florida's four- and five-year statutes of limitations. Even assuming Plaintiffs' claims were timely filed, the complaint failed to sufficiently allege claims for relief.

On April 3, 2014, the district court granted defendant HVB's motion to dismiss the complaint as barred by the statutes of limitations. Liberally applying Florida's delayed discovery rule,[4] the district court found that "the various IRS notices regarding tax shelters and CARDS transactions, [HVB's admissions in] the DPA, and the IRS Notices of Deficiency should have alerted Plaintiffs, through the exercise of due diligence, to all of the facts giving rise to Plaintiffs' claims in this

---

[4]The district court acknowledged that Plaintiffs expressly disclaimed reliance on the delayed discovery rule. However, because the rule was relevant to Plaintiffs' fraud-based claims and civil RICO claim, and each of Plaintiffs' claims arose from the same wrongful conduct, the district court assumed the applicability of the delayed discovery rule to all of Plaintiffs' claims.

lawsuit, including that the various transaction fees Plaintiffs paid to HVB and the other CARDS Dealers were wrongfully obtained."

The district court found that Plaintiffs' claims accrued no later than December 31, 2007, when Plaintiffs filed their petitions in the tax court. Plaintiffs had until December 31, 2011, to timely file their fraud, conspiracy, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and negligent supervision claims, and until December 31, 2012, to timely file their Florida civil RICO claim. Because Plaintiffs did not file the complaint until November 4, 2013, all of their claims were time-barred.

The district court rejected Plaintiffs' argument that their claims did not accrue until November 1, 2012, because they did not sustain any damages until the tax court issued its final decision. By December 5, 2001—Plaintiffs' mandatory repayment date—Plaintiffs had sustained part of the damages they sought to recover, including the fees they paid to HVB.

The district court found Plaintiffs' reliance on the Florida Supreme Court's decision in Peat, Marwick, Mitchell & Co. v. Lane, 565 So. 2d 1323 (Fla. 1990), to be misplaced. Peat, Marwick, which involved accrual of the limitations period in an accounting malpractice action, was wholly distinguishable and limited to professional malpractice claims (which Plaintiffs had not alleged). Accordingly, the district court dismissed Plaintiffs' complaint as time-barred.

13

This appeal followed.

## II.  STANDARD OF REVIEW

We review <u>de novo</u> the district court's grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim, accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff.  <u>Fuller v. SunTrust Banks, Inc.</u>, 744 F.3d 685, 687 n.1 (11th Cir. 2014).  The district court's interpretation and application of the statute of limitations is also reviewed <u>de novo</u>. <u>Ctr. for Biological Diversity v. Hamilton</u>, 453 F.3d 1331, 1334 (11th Cir. 2006).

## III.  DISCUSSION

The parties agree that Florida law controls the sole issue in this appeal: when did Plaintiffs' claims against HVB accrue for purposes of the statutes of limitations.  We set forth the relevant Florida law before outlining the parties' contentions on appeal.  We then state the certified question.

### A.    Florida Accrual Rules

Absent statutory tolling or another exception, the Florida statute of limitations begins to run from the time the cause of action accrues.  Fla. Stat. § 95.031.  "A cause of action accrues when the last element constituting the cause of action occurs."  <u>Id.</u> § 95.031(1).  In other words, "a cause of action cannot be said to have accrued . . . until an action may be brought."  <u>State Farm Mut. Auto. Ins. Co. v. Lee</u>, 678 So. 2d 818, 821 (Fla. 1996).

14

There is a statutory exception to Florida's general rule that a cause of action accrues upon occurrence of its last element.  This "delayed discovery" exception operates to postpone accrual "until the plaintiff either knows or reasonably should know of the tortious act giving rise to the cause of action."  Hearndon v. Graham, 767 So. 2d 1179, 1184 (Fla. 2000); see Davis v. Monahan, 832 So. 2d 708, 709-10 (Fla. 2002) (holding that the only statutory bases for the delayed discovery rule apply to fraud, products liability, professional and medical malpractice, and intentional torts based on abuse).

In relevant part, "[a]n action founded upon fraud" accrues when "the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence."  Fla. Stat. § 95.031(2)(a).  In any event, claims founded upon fraud must be brought "within 12 years after the date of the commission of the alleged fraud, regardless of the date the fraud was or should have been discovered."  Id.

In addition, under Florida law, a cause of action generally accrues upon the first injury caused by another's wrongful act:

> [W]here an injury, although slight, is sustained in consequence of the wrongful act of another, and the law affords a remedy therefor, the statute of limitations attaches at once.  It is not material that all the damages resulting from the act shall have been sustained at that time and the running of the statute is not postponed by the fact that the actual or substantial damages do not occur until a later date.

15

City of Miami v. Brooks, 70 So. 2d 306, 308 (Fla. 1954); see also Hynd v. Ireland, 582 So. 2d 772, 773 (Fla. Dist. Ct. App. 1991) ("[I]t is immaterial that not all the damages resulting from [the defendant's] alleged fraud had then been sustained. Clearly, damage actually occurred . . . and the [plaintiff] had more than the mere possibility of future damage.").[5]

## B.    Peat, Marwick: Accrual of Professional Malpractice Claims

In Peat, Marwick, the Florida Supreme Court resolved the issue of "whether the commencement of the [two-year] limitations period in an accounting malpractice action relating to income tax preparation occurs with the receipt of a [notice of deficiency] or with the conclusion of the appeals process, under circumstances where the accountant disagrees with the IRS's determination."  565 So. 2d at 1325.  Based on their accountant's recommendations, the plaintiffs in Peat, Marwick had claimed certain deductions for which the IRS subsequently issued a notice of deficiency.  Following their accountant's advice, the plaintiffs challenged the IRS's determination in tax court.  After the tax court entered judgment against the plaintiffs, they filed a malpractice action against their accountant.  Id. at 1324-25.

---

[5]"As this is a diversity case, in the absence of a controlling decision from the Florida Supreme Court, we are obligated to follow decisions from the Florida intermediate appellate courts unless there is some persuasive indication that the Supreme Court would decide the case differently."  Raie v. Cheminova, Inc., 336 F.3d 1278, 1280 (11th Cir. 2003).

Both the plaintiffs and their accountant believed that the accounting advice was correct until the tax court issued its adverse decision. "[C]onsequently, there was no injury" until that time. Id. at 1326; see also id. at 1325 (noting that "a cause of action for legal malpractice does not accrue until the underlying legal proceeding has been completed on appellate review because, until that time, one cannot determine if there was any actionable error by the attorney"). If the IRS's notice of deficiency conclusively established the requisite injury, the plaintiffs would have had to file their malpractice action at the same time they were challenging the IRS's determination in their tax court appeal. Id. at 1326. The Florida Supreme Court reasoned that it was illogical to require the plaintiffs to assert "two legally inconsistent positions . . . to maintain a cause of action for professional malpractice." Id.

Accordingly, the Florida Supreme Court held that, "under the circumstances of this case, where the accountant did not acknowledge error, the limitations period for accounting malpractice commenced when the United States Tax Court entered its judgment." Id. at 1327.

The Florida Supreme Court revisited Peat, Marwick in Blumberg v. USAA Casualty Ins. Co., 790 So. 2d 1061 (Fla. 2001). The insured in Blumberg sued his insurance company to establish his entitlement to insurance coverage and later sued his insurance agent for negligent failure to procure valid coverage. Id. at

17

1063.  The issue was the accrual of the insured's claim against the insurance agent, which the Florida Supreme Court characterized as analogous to the malpractice claim in Peat, Marwick.  Id. at 1065 & n.3.

The Florida Supreme Court explained the logic behind Peat, Marwick was "that a client should not be forced to bring a claim against an accountant prior to the time that the client incurred damages.  A rule that would mandate simultaneous suits would hinder the defense of the underlying claim and prematurely disrupt an otherwise harmonious business relationship."  Id. at 1065.  Consistent with Peat, Marwick, the Florida Supreme Court held that "in the circumstances presented here, a negligence/malpractice cause of action [against the agent] accrues when the client incurs damages at the conclusion of the related or underlying judicial proceedings" against the insurance company.  Id.

The Florida Supreme Court, however, has cautioned against construing the holding in Peat, Marwick, a professional malpractice case, too broadly:

> Peat, Marwick does not articulate a rule that the running of the statute of limitations for professional malpractice is held in abeyance until the conclusion of any collateral litigation in which the client might assert a position inconsistent with the malpractice claim.  Such a rule could not be reconciled with the commencement point—"the time the cause of action is discovered or should have been discovered"—established [by statute].

Larson & Larson, P.A. v. TSE Indus., Inc., 22 So. 3d 36, 44 (Fla. 2009).  We also note that Florida courts have declined to extend malpractice-specific rules to other

18

causes of action.  See, e.g., Nale v. Montgomery, 768 So. 2d 1166, 1167-68 (Fla. Dist. Ct. App. 2000) (plaintiffs "cannot rely on malpractice cases to establish accrual of a cause of action and then apply it to a common law negligence action").

## C.    Applicable Statutes of Limitations

Here, Plaintiffs brought claims for violation of Florida's RICO statute (Count 1), common law fraud (Count 2), aiding and abetting fraud (Count 3), conspiracy to commit fraud (Count 4), breach of fiduciary duty (Count 5), aiding and abetting breach of fiduciary duty (Count 6), and negligent supervision (Count 7).

Under Florida law, all of Plaintiffs' claims, except for the civil RICO claim in Count 1, are governed by a four-year statute of limitations.  See Fla. Stat. § 95.11(3)(a), (j), (p) (prescribing four years for actions "founded on negligence," actions "founded on fraud," and any actions "not specifically provided for in these statutes").  The statute of limitations for Plaintiffs' civil RICO claim is five years. See id. § 772.17.

In accordance with the general accrual rule, Plaintiffs' claims for conspiracy, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and negligent supervision accrued when they suffered damages.  See id. § 95.031(1) ("A cause of action accrues when the last element constituting the cause of action occurs."); Olson v. Johnson, 961 So. 2d 356, 360 (Fla. Dist. Ct. App. 2007) ("A

19

conspiracy cause of action accrues when the plaintiff suffers damages as a result of the acts performed pursuant to the conspiracy."); Kelly v. Lodwick, 82 So. 3d 855, 857 (Fla. Dist. Ct. App. 2011) ("The last element constituting a cause of action for negligence or breach of fiduciary duty is the occurrence of damages.").

In accordance with the statutory exception for delayed discovery, Plaintiffs' claims for fraud and aiding and abetting fraud accrued when they knew or should have known that they suffered damages.  See Fla. Stat. § 95.031(2)(a); Davis, 832 So. 2d at 709 (claim accrues when the plaintiff "either knows or should know that the last element of the cause of action occurred"); see also Thompkins v. Lil' Joe Records, Inc., 476 F.3d 1294, 1315 (11th Cir. 2007) (listing the four elements of a fraud claim under Florida law, including "consequent injury to the party acting in reliance" on the false representation).

We also assume, without deciding, that Plaintiffs' civil RICO claim accrued "when the injury was or should have been discovered."  See Lehman v. Lucom, 727 F.3d 1326, 1330 (11th Cir. 2013) (quotation marks omitted); Jackson v. BellSouth Telecomms., 372 F.3d 1250, 1263-64 (11th Cir. 2004) (interpretation of Florida's civil RICO statute is informed by case law interpreting the federal RICO statute).

**D.    Contentions of the Parties**

20

The parties' primary dispute on appeal concerns the date that Plaintiffs first suffered an injury in this case.

1.    Plaintiffs

Plaintiffs argue that they suffered no cognizable injury until the final resolution of the tax case. Thus, their claims did not accrue until the tax court issued its final decision on November 1, 2012. According to Plaintiffs, fees and costs are not "inherently injurious" under Florida law. The CARDS fees and costs they paid in 2001 to obtain economic benefits and tax savings did not become redressable injuries until the tax court's adverse ruling. Had the CARDS shelter been upheld by the tax court or never challenged, Plaintiffs would have had no claim for fees or tax penalties and would have suffered no injury. Because HVB's admissions of wrongdoing were not dispositive of Plaintiffs' tax liability, Plaintiffs would have no claim against HVB if they had prevailed in the tax court.

Plaintiffs rely on Peat, Marwick and Blumberg for the proposition that a taxpayer's claims relating to an illegal tax shelter do not accrue until the taxpayer's underlying dispute with the IRS is final. Specifically, the operative accrual date is when the tax court enters final judgment, rather than when the IRS issues a notice of deficiency. Unless the tax court upholds the deficiency, the taxpayer has not been injured. Rather, the taxpayer received exactly what he bargained for—advice and implementation of a tax strategy in exchange for a fee. The district court's

21

decision places Florida tax shelter fraud victims in an "impossible situation" where suits brought prior to the tax court determination are premature but suits filed after are untimely.

Plaintiffs contend that the district court erred by limiting the dispositive rule in Peat, Marwick to (1) professional malpractice claims or (2) situations involving a continuing harmonious relationship between the parties. Florida law is clear that, both in malpractice and non-malpractice cases, a claim accrues only upon actual injury, not merely potential injury. Moreover, the policy considerations underlying Peat, Marwick apply here. As in Peat, Marwick, Plaintiffs did not suffer any cognizable injury until the tax court upheld the deficiency, and should not be required to assert "two legally inconsistent positions" at the same time. Because the existence of a harmonious relationship is unnecessary, HVB's admissions of wrongdoing and Plaintiffs' knowledge thereof do not change the date of actual injury.

Plaintiffs argue that, to the extent the district court focused on HVB's admissions in the 2006 DPA as a basis for accrual, upholding the district court's ruling would result in the same claim accruing against different defendants at different times based on the defendants' public statements or admissions. This result is inconsistent with Florida law's preference for "bright-line" accrual rules, which promote certainty in applying statutes of limitations. The district court's

22

admissions-focused, "defendant-by-defendant" accrual rule also conflicts with Florida law's "injury-by-injury" formula for calculating accrual.

### 2.    HVB

On the other hand, HVB argues that Plaintiffs' claims are time-barred because they accrued no later than December 5, 2001, when Plaintiffs incurred part of the damages they seek to recover.  By their own admission in the complaint, Plaintiffs first suffered actual injury in 2001 when they paid "unconscionable fees" for a long-term CARDS loan that HVB terminated prematurely.  This early termination deprived Plaintiffs of the long-term financing they sought to increase M&S's bonding capacity, which was the legitimate "business purpose" they alleged under oath to the tax court.  Under Florida's settled "first injury" rule, Plaintiffs' claims accrued in 2001, when they first suffered injury that was neither hypothetical nor speculative.

HVB contends that Peat, Marwick, an accountant malpractice case, is expressly limited to claims for professional malpractice.  Plaintiffs here did not— and could not—assert any malpractice claims against HVB, which are subject to Florida's two-year statute of limitations (rather than the four- and five-year periods applicable to Plaintiffs' claims).  Courts have never applied the malpractice accrual rule announced in Peat, Marwick outside of the malpractice context, and there is no

23

legal or logical basis for the unprecedented expansion of Florida law sought by Plaintiffs.

HVB argues that the policy concerns behind <u>Peat, Marwick</u> are inapplicable here. In a malpractice action like <u>Peat, Marwick</u>, the existence of an injury is speculative until the entry of a final judgment adverse to the client, because only then can one determine if the professional committed any actionable error. In contrast, the existence of the injury Plaintiffs alleged they suffered in 2001 was not contingent on the outcome of the tax court case. Plaintiffs would not be required to take directly contrary positions, as they acknowledge that HVB's admitted conduct was not dispositive of their tax liability. Furthermore, this case does not implicate the policy concern of protecting client–professional relationships from needless lawsuits.

Plaintiffs' argument that the district court adopted a "defendant-by-defendant" accrual rule mischaracterizes the district court's order, which had no occasion to consider when claims accrued against non-existent other defendants. The argument also relies on the faulty premise that <u>Peat, Marwick</u> applies to Plaintiffs' claims, which it does not. To the extent it remains viable, the supposed "bright-line" rule referred to by Plaintiffs has never been applied to a non-malpractice claim.

## IV.  CERTIFICATION

It is not clear under Florida law when Plaintiffs first suffered injury, and thus when their claims against HVB accrued for purposes of the applicable statutes of limitations. Because the relevant facts are undisputed, and this appeal depends wholly on interpretations of Florida law regarding the statute of limitations, we certify the following question to the Florida Supreme Court:

UNDER FLORIDA LAW AND THE FACTS IN THIS CASE, DO THE CLAIMS OF THE PLAINTIFF TAXPAYERS RELATING TO THE CARDS TAX SHELTER ACCRUE AT THE TIME THE IRS ISSUES A NOTICE OF DEFICIENCY OR WHEN THE TAXPAYERS' UNDERLYING DISPUTE WITH THE IRS IS CONCLUDED OR FINAL?

The phrasing of this certified question is not intended to restrict the Supreme Court's consideration of the issues or the manner in which the answers are given. To assist the Supreme Court's consideration of this case, the entire record and the parties' briefs shall be transmitted to the Florida Supreme Court.

**QUESTION CERTIFIED.**