[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-14758
_____

D.C. Docket No. 3:09-cv-00446-TJC-JBT

GORDON LAWRIE, et al.,
individually and on behalf of all
others similarly situated,

                              Plaintiffs - Appellants,

versus

GINN DEVELOPMENT COMPANY, LLC,
et al.,

                              Defendants - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(July 28, 2016)

Before TJOFLAT and ROSENBAUM, Circuit Judges, and KAPLAN,[*] District Judge.

PER CURIAM:

In pleading, as in many aspects of life, quality matters more than quantity. Plaintiffs in this lawsuit have tried to plead a cause of action for real estate fraud four times, with their most recent complaint launching a 142-page barrage of allegations against Defendants. Despite the pleading's impressive magnitude, the district court found that Plaintiffs' Third Amended Complaint lacked, among other things, the quality of pleading demanded by Rule 9(b) of the Federal Rules of Civil Procedure, and it dismissed the case with prejudice. After reviewing the parties' pleadings and arguments, and with the benefit of oral argument, we now affirm.

**I.**

Plaintiffs-Appellants in this case include individuals who purchased real estate in several planned residential developments[1] conceived by Defendants-Appellees Ginn Development Company, LLC ("Ginn"), and Lubert-Adler Partners, L.P. ("Lubert-Adler"), during the real-estate boom of the mid-2000s. Plaintiffs have alleged that their purchases have since lost significant value. But

---

[*] Honorable Lewis A. Kaplan, United States District Judge for the Southern District of New York, sitting by designation.

[1] The five developments relevant to this appeal include the following: Tesoro & Tesoro Preserve in Port St. Lucie, Florida; Reunion Resort in Orlando, Florida; Bella Collina in Montverde, Florida; The Conservatory at Hammock Beach, in Palm Coast, Florida; and Laurelmor in Boone, North Carolina.

they do not attribute their losses to the collapse of the real-estate bubble and subsequent economic downturn. Instead, Plaintiffs allege that their losses result from a conspiracy among Ginn, Lubert-Adler, Defendant-Appellee Ginn Title Services, LLC ("GTS") (collectively, "the Defendants"), and several now-dismissed banks to fraudulently inflate the sale prices of the properties purchased by Plaintiffs above their known fair market values.[2]

To vindicate their losses, Plaintiffs filed a class-action civil complaint alleging that the Defendants and the banks violated provisions of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 ("RICO"), as well as several state laws. Plaintiffs amended their complaint once on their own initiative, but the district court dismissed that First Amended Complaint for failing to satisfy the pleading standards of Rules 8 and 9(b), Fed. R. Civ. P. In that first dismissal order, the district court thoughtfully explained the deficiencies of Plaintiffs' allegations and granted leave for Plaintiffs to file another complaint.

---

[2] Generally, the Plaintiffs allege a seven-part scheme: 1) Defendants created "extravagant" development plans with slick promotional literature that they marketed to Plaintiffs; 2) Ginn and Lubert-Adler developed the properties just enough to fool Plaintiffs into thinking their plans were serious, although they never intended to complete the developments; 3) Defendants "aggressively" pursued Plaintiffs with misleading sales tactics, "lies and misrepresentations"; 4) Defendants set "fixed non-negotiable prices" for the properties and represented those prices to reflect fair market value when in fact the prices well exceeded market value; 5) Defendants supported the inflated prices with fraudulently recorded property records; 6) Defendants obtained and used fraudulent appraisals of the properties to support the inflated values; and 7) Defendants enlisted the cooperation of "complicit" banks who financed mortgages that they knew exceeded the actual value of the properties.

Plaintiffs filed a Second Amended Complaint that was about half the length of the First Amended Complaint but still failed to allege sufficient facts to connect the individual Plaintiffs' transactions and losses to specific fraudulent activities by Defendants. The district court once again dismissed the action but granted Plaintiffs one final opportunity to amend their complaint to satisfy pleading requirements.

In response, Plaintiffs submitted their fourth attempt at pleading a cause of action. Plaintiffs' Third Amended Complaint ("TAC") spans 142 pages with 366 numbered paragraphs, includes another 85 pages of exhibits, and is, as accurately described by the magistrate judge, "an unwieldy, prolix 'shotgun pleading.'"

Count I of the TAC alleges that Defendants conducted an enterprise through a pattern of racketeering activity—namely mail fraud and wire fraud—in violation of RICO, 18 U.S.C. § 1962(c). Count II asserts a RICO conspiracy in violation of 18 U.S.C. § 1962(d). Count III charges, apparently under state law, a claim for "civil conspiracy" based on Defendants' "agreement to artificially inflate the value of properties . . . through numerous acts of fraud and misrepresentations with intent to defraud."[3]

Defendants' motions to dismiss the TAC were referred to the magistrate judge, who recommended the dismissal with prejudice of Plaintiffs' claims.

---

[3] The remaining counts in the TAC pertain to only the now dismissed Bank Defendants, Fifth Third Bank, Suntrust, and Wachovia, and are no longer relevant here.

4

Among other bases, the magistrate judge justified his recommendation on grounds that Plaintiffs failed once again "to meaningfully connect any specific fraudulent conduct to any specific damages suffered by any specific Plaintiff."  As a result of this deficiency, the magistrate judge concluded, the TAC did not meet the pleading standards of Rules 8 or 9(b) of the Federal Rules of Civil Procedure.  Because Plaintiffs had repeatedly failed to cure the deficiencies of their complaint and, in the magistrate judge's view, further amendment would be futile, the magistrate judge recommended dismissal with prejudice.  After a *de novo* review, the district judge adopted the magistrate judge's recommendation to dismiss the case with prejudice for "violations of Federal Rules of Civil Procedure 8 and 9."  Plaintiffs now appeal the dismissal of their TAC, arguing that they adequately pled their fraud-premised RICO and civil conspiracy claims.

## II.

### A.

We review *de novo* a district court's dismissal of a complaint for failure to state a claim under Rule 12(b)(6), "accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff."  *Ironworkers Local Union 68 v. AstraZeneca Pharm., LP*, 634 F.3d 1352, 1359 (11th Cir. 2011) (quoting *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1288 (11th Cir. 2010)). To survive a motion to dismiss, plaintiffs must allege sufficient facts to push their

5

"claims across the line from conceivable to plausible." *Am. Dental Ass'n*, 605 F.3d at 1289 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)).

**B.**

To state a claim under RICO, 18 U.S.C. § 1962(c), plaintiffs must allege four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1282 (11th Cir. 2006). Additionally, plaintiffs bringing a civil RICO action for damages must show (1) that an injury occurred to business or property and (2) "that such injury was 'by reason of' the substantive RICO violation." 18 U.S.C. § 1964(c); *Williams*, 465 F.3d at 1283. The "by reason of" standard requires that the defendant's misconduct directly and proximately cause the plaintiff's injury. *Id.* at 1287. When evaluating proximate cause in a RICO case, a court must ask "whether the alleged violation led directly to the plaintiff's injuries." *Id.* (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461, 126 S. Ct. 1991, 1998 (2006)).

To establish a pattern of racketeering activity, a plaintiff must allege that a defendant committed at least two predicate racketeering acts that demonstrate criminal conduct of a continuing nature. *See Jackson v. BellSouth Telecomm.*, 372 F.3d 1250, 1264 (11th Cir. 2004). Racketeering conduct includes any acts that are

6

indictable under 18 U.S.C. § 1341 (mail fraud) or 18 U.S.C. § 1343 (wire fraud). *See* 18 U.S.C. § 1961(1); *Bridge v. Phoenx Bond & Indem. Co.*, 553 U.S. 639, 647-48, 128 S. Ct. 2131, 2138 (2008). "Mail or wire fraud occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme." *Am. Dental Ass'n*, 605 F.3d at 1290 (quoting *Pelletier v. Zweifel*, 921 F.2d 1465, 1498 (11th Cir. 1991)). Fraud requires misrepresentation or concealment of a material fact; mere puffery or sales talk is insufficient to sustain an allegation of mail or wire fraud. *See United States v. Rodriguez*, 732 F.3d 1299, 1303 (11th Cir. 2013).

In this Circuit, when a RICO claim is premised on predicate acts of mail or wire fraud, the complaint must also satisfy the heightened pleading standard of Rule 9(b), Federal Rules of Civil Procedure. *Am. Dental Ass'n*, 605 F.3d at 1291. Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy Rule 9(b), RICO plaintiffs "must allege: '(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud,'" and must do so with respect to each defendant's participation in the fraud. *Am. Dental Ass'n*,

605 F.3d at 1291 (quoting *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380-81 (11th Cir. 1997)).

## III.

Before resolving the issues of this appeal, it is be helpful to review what the remaining[4] Plaintiffs have actually alleged—and not alleged—in the TAC about their specific purchases and the Defendants' conduct.

A. Gordon and Margaret Lawrie

The Lawries purchased five lots in two developments between 2002 and 2005.  By themselves, they purchased Lot 163 in Reunion for $215,000 and Lot 352 in Bella Collina for $544,900.  Jointly with plaintiff Charles McKinlay, Gordon Lawrie purchased three other lots in Bella Collina: Lot 37 for $1.5 million, Lot 390 for $5.35 million, and Lot 207 for $655,900.

Preceding each purchase, Ginn showed the Lawries "non-negotiable prices" that unidentified Ginn salespeople "represented were the fair market value of the properties."  Each property was also supported by standard sales literature depicting "extravagant and high class amenities."  Specifically with respect to their

---

[4] At this point, the only named Plaintiffs-Appellants left in the case are Gordon and Margaret Lawrie, Charles McKinlay, Stephen and Elizabeth Frieze, Andrew and Charlotte Billington, Johnny Miller, and Heather Petts, and the only Defendants-Appellees left are Ginn, GTS, and Lubert-Adler.  Prior to dismissal of the TAC, Plaintiffs Naomi Berger, Barry Sobel, Phillip Button, and Paul Tipton dismissed their claims against the Ginn entities and Lubert-Adler.  After this appeal was filed, all Plaintiffs settled with and dismissed the Bank Defendants from this case.  Since Berger, Sobel, Button, and Tipton had pending claims against only the Bank Defendants when the district court dismissed the TAC, and those Banks are no longer parties to the lawsuit, it appears that those four Plaintiffs have settled all of their claims.

Reunion purchase, the Lawries were shown the price list on October 4, 2002. They were also shown a spreadsheet reflecting increasing property values in the development, including an entry for one property that sold for $60,000 and was worth $300,000 a year later.

Before their purchase of Bella Collina Lot 352 in December 2004, Ginn salesman Rusty Rogers "assured the Lawries that the properties were listed at fair market value at the non-negotiable prices at which they were offered as reflected on the pricing sheet," that demand was high and therefore a "lottery" was required to sell the lots, and that the next group of lots to be sold would start at $700,000. The Lawries were shown Bella Collina promotional literature depicting amenities. Jack and Brady Koegel, officers of R-G Crown Bank, "vouched for" the representations of value shown to the Lawries. Following these events, the Lawries put $110,000 down and financed the balance of Lot 352's $544,900 purchase price through R-G Crown Bank, later owned by now-dismissed Defendant Fifth Third Bank.

Gordon Lawrie and McKinlay purchased Lot 390 on May 20, 2005. This lot was bundled with a home-construction contract. Brady Koegel again "vouched" for the combined value of $5.35 million. The TAC alleges conclusorily that R-G Crown was "improperly using builder leaseback provisions to inflate the value" of

9

the contract beyond fair market value, without explaining how the alleged leaseback was improper or how it affected prices.

Lawrie and McKinlay purchased Lot 37 on June 7, 2005. Rusty Rogers told them that Lot 37 was the "best lot in Bella Collina" and advised them that "if they paid the $1.5 million dollar purchase price in cash they would be able to purchase it and that it would be worth $3 million almost immediately."

Finally, the Lawries aver that they spent over $8 million dollars, "which far exceeds the fair market value of the properties at the time they were purchased, leading to losses in excess of $5 million in terms of mortgage payments made, down payments paid and other expenses incurred in connection with carrying the properties and/or losing the properties through legal proceedings."

B. Charles McKinlay

Between 2004 and 2005, McKinlay bought five properties at Bella Collina: Lot 371 for $544,900; Lot 337 for $784,900; Lot 390 for $5.35 million; Lot 37 for $1.5 million; and Lot 207 for $655,900. Lots 390, 37, and 207 were purchased jointly with Gordon Lawrie.

Before purchasing these properties, Rogers and other unidentified Ginn salespeople represented that high demand existed for the lots, the lots' prices reflected their fair market value, and prior sales and planned amenities supported the property values. McKinlay has not identified any specific statements made

10

with respect to any of the properties he bought, nor has he identified who made any specific statement or when any such statements were made.

And though McKinlay alleges that he financed two properties through R-G Crown Bank, he identifies only one: Lot 390. He also explains that he financed these two properties based on the representations of Jack and Brady Koegel, who "vouched" for the value of the Bella Collina properties generally, but does not assert when the Koegels vouched for the value. In addition, McKinlay insinuates that the bank's willingness to finance the mortgages he entered misled him into believing the prices of the properties were legitimate.

In all, McKinlay contends that he spent over $9 million on properties and suffered losses in excess of $5 million "in terms of mortgage payments made, down payments paid and other expenses incurred in connection with carrying the properties and/or losing the properties through legal proceedings."

C. Stephen and Elizabeth Frieze

The Friezes bought two properties: Lot 227 in the Reunion development, purchased for $550,000 on August 20, 2004; and Lot 391 in Bella Collina for $4.6 million on January 28, 2005.

With respect to Lot 227, the Friezes allege that Ginn salesperson Jeff Cox introduced them to Brady Koegel, who "vouched for the property's value," stated that there would be no problem getting a loan for $1.3 million to finance the

11

purchase of the lot and home construction, that R-G Bank was "anxious" to be involved in the project, and that Koegel's own family had invested in the Reunion development.  The Friezes do not attribute any specific misrepresentations to Cox and, beyond vouching for the value of the property, do not aver that any of Koegel's statements were false.

Rather, the Friezes allege that Brady Koegel and R-G Crown Bank used "complicit appraiser" David Tremblay to provide a fraudulent appraisal of the property and that, in buying Lott 227, they relied on the willingness of the bank to finance the mortgage, which in turn relied on Tremblay's appraisal.  Though the Friezes do not allege direct reliance on Tremblay's appraisal, in one part of the TAC, they claim that the appraisal was fraudulent because Tremblay used an unspecified "predetermined appraisal amount to paper the mortgage for Lot 227 and construction thereon in Reunion."  Elsewhere in the TAC, the Friezes assert that, at the request of Brady Koegel, Tremblay based the appraisal of Lot 227 on "inappropriate comparables from a well-established Disney community called Celebration, over 15 miles away."[5]

As for Lot 391, the Friezes allege that they purchased the lot after being approached by Rogers, who said the property's market value "currently matched,

---

[5] The TAC also alleges that Tremblay was copied on an "outlandish" June 22, 2006, email where Brady Koegel instructed Stephen Frieze that Frieze could simply tell the appraiser what value he wanted to see on the appraisal.  Of course, this June 2006 email occurred *after* the Friezes' two purchases detailed in the TAC.

and would rapidly exceed, the price at which it was offered." At an unspecified time before purchasing the lot, the Friezes also visited Rogers onsite at Bella Collina. There, Rogers showed them the non-negotiable price list, represented that the prices were fair market values, and provided the Friezes with promotional literature with the planned amenities. According to the TAC, Brady Koegel once again "vouched" for the value of Lot 391, and the Friezes relied on this representation as well as Koegel's "ability to produce an appraisal justifying the $4.6 million sales price." The Friezes do not claim that they have suffered any losses.

D. Andrew and Charlotte Billington

The Billingtons apparently bought properties in three Ginn developments: Conservatory, Bella Collina, and Reunion. They acquired Lot 330 in Conservatory on September 12, 2005, for $449,900. In Bella Collina, they purchased Lot 2 on an unspecified date for an unspecified price; Lot 134 for $1,340,900 on July 4, 2004; and Lot 331 for $854,900 on October 29, 2004.

Confusingly, in one paragraph, the Billingtons allege that they bought just one property in Reunion, but then in another paragraph assert that they "'won' the right to purchase Lots 8, 9, 10, 54, 56, 85 in Reunion Villages at the launch event and ultimately purchased the lots in December 2004, financing four of them with First National Bank of Florida, through Roy Snoeblen." As a result of the

13

seemingly contradictory assertions in the TAC, it is not clear how many Reunion lots the Billingtons purchased.  Nor do the Billingtons allege any prices paid for their Reunion property or properties.  Instead, they aver simply that Snoeblen "vouched for the fair market value of the properties at the prices for which they were purchasing" and that they relied on this representation as well as other unspecified representations made by unidentified salespeople, including one that "there was 'blue chip' funding behind the project."  But the Billingtons do not claim that the "blue chip" funding did not exist or explain how the remark was otherwise misleading.  As with the other Plaintiffs, the TAC contends that the Billingtons relied on Ginn promotional literature depicting planned amenities in the communities.

The TAC further asserts that the Billingtons participated in a lottery event for the Bella Collina properties.  Before that event, Ginn salesman Brett Campbell emailed a PowerPoint presentation to the participants stating that Lubert-Adler owned 50% of Ginn and 80% of each project.  But the Billingtons do not allege that this representation was false.  As for the "lottery," the Billingtons aver that it was "designed to and did" create "an illusion" of short supply and high demand for the properties.  Like the other Plaintiffs, the Billingtons allege they generally relied on the price lists and promotional literature and the willingness of banks to finance their purchases.  In addition, the Billingtons complain that Snoeblen "falsely

14

vouched" for the value of Lot 331. In terms of damages, the Billingtons aver generally that they suffered "damages of hundreds of thousands of dollars."

E. Johnny Miller

Miller purchased three properties: Lot 110 in Bella Collina for $680,900 on June 22, 2005; Lot 50 in Reunion for $263,000 on October 30, 2006; and Lot 101 in Laurelmor for $489,900 on November 17, 2006.

With respect to Lot 110, Miller asserts that he was only interested in purchasing Lot 110. But then he "purportedly 'won'" a lottery to buy the lot, insinuating without actually alleging that the lottery was a sham of some sort. Miller "understood from Roy Snoeblen that the property appraised for the price at which it was offered and was a good value at that price." According to the TAC, a forensic appraisal conducted in November 2010 demonstrated that Lot 110 should not have been appraised at the price Miller paid for it, but Miller does not allege what the forensic appraisal price was or even, for that matter, that it was lower than the purchase price he paid or that he has suffered any damages concerning Lot 110. At most, the TAC claims that the forensic appraisal determined that the original appraisal of Lot 110 did not meet appraisal-industry standards and failed to adequately account for the risk that the developments would not be completed. Plaintiffs allege that Ginn "uniformly instructed" appraisers to conduct deficient

15

appraisals and that Lubert-Adler knew about these instructions.  But Plaintiffs offer no more specifics about who gave these instructions or when they were given.

Turning to Reunion Lot 50, Miller financed the purchase of the property through First People's Bank and then obtained a construction loan from Suntrust Bank that was arranged by loan officer Michael Knight.  The TAC further alleges that "complicit appraiser" Diana David performed the appraisal for the construction loan, **[Id.]** though Miller does not explain how the construction loan influenced the purchase price of the property or complain that Lot 50 was supported by any fraudulent appraisals.  And while Miller also claims that Ginn salesperson Fysuly Shearer told him that Bobby Ginn was planning to spend $12 million on the infrastructure at Reunion, Miller does not assert that this statement was false or fraudulent.

Concerning Lot 101, Miller alleges that he relied on unidentified Ginn sales representations and Wachovia's willingness to finance the purchase in concluding that the purchase price was supported.  But the TAC makes no specific fraud allegations about Lot 101.  For both Lots 50 and 101, Miller does not claim an amount of damages suffered.  Instead he asserts just generally that he suffered damages.

F. Heather Petts

16

Petts, along with now-dismissed Plaintiff Philip Button, bought two lots: Lot 16 in Reunion for an unspecified price in October 2004 and Lot 206 in Bella Collina for $655,900 on August 29, 2005.

Petts alleges that Ginn sales team member Patrick Lenihan "heavily solicited" Petts and Button, although the TAC generally addresses only Lenihan's interactions with Button.  After Button had reserved property, Petts alleges, Lenihan sent her and Button appraisals for Reunion properties that "used improper comparables and reflected artificially high values for the properties."  The TAC contains no more specifics about these appraisals, such as who conducted them, what they included, and whether they concerned the Reunion property that Petts actually purchased.  Petts also claims that banker Snoeblen "vouched for the value of the Reunion property and was actively promoting sales in the development" but does not allege how these statements were false other than by asserting in a conclusory fashion that they were "part of the scheme."

With respect to Lot 206, the TAC asserts that Brady Koegel advised Button that he originally had a reservation on that property, but he could not close.  So Koegel encouraged Button to buy Lot 206 because it was "such a good opportunity and value at the stated price."  Petts claims that she relied on this representation to Button in buying Lot 206.  She also alleges that Snoeblen vouched for the value of

17

the property.  As a result of the alleged scheme, Petts contends, she suffered an unspecified amount of damages.

## G. Generalized Allegations of Defendants' Conduct

Besides the allegations set forth above, Plaintiffs levy a number of allegations at Defendants generally.  But Plaintiffs fail to ever connect these accusations to Plaintiffs' actual purchases or damages.  For example, Plaintiffs assert that Ginn and Lubert-Adler, in cooperation with their marketing firm, conveyed an impression of high demand and hosted "sham" lotteries where purchasers were actually preselected.  But Plaintiffs do not explain how the lotteries affected the prices Plaintiffs paid or how the lotteries damaged Plaintiffs, all of whom actually obtained the right to purchase property.  In another allegation, Plaintiffs aver that a Ginn salesperson falsely told a *non-Plaintiff* buyer that a lot had sold for three times its actual sales price.  But Plaintiffs do not explain how this statement to a non-Plaintiff misled them in purchasing their lots.

With respect to the lavish amenities that Defendants allegedly promised for the properties, Plaintiffs contend that Defendants never built many of them. Although the TAC concedes that some amenities were built "to give credence to [Defendants'] representations that all the amenities they promised would indeed be built," Plaintiffs claim generally that Defendants never intended to build any of them.  But the TAC discusses only one specific fraudulently promised amenity:

18

boat docks in Bella Collina on Lake Apopka.  Plaintiffs claim that Defendants knew such boat docks were impossible to build because the lake was polluted and undesirable.  They further assert that permits to build the docks had already been denied, although they do not state when that occurred.  Nor do they indicate the reasons for the alleged denials or whether the denials could be appealed, either of which could bear on whether docks ultimately could be built.  And while the Lawries, Friezes, and Billingtons all contend that they "relied" on the promise of boat docks among other representations when purchasing their Bella Collina properties, they do not allege that the absence of boat docks materially affected the prices they paid or their decisions to purchase those properties.

In support of their theory that Defendants fraudulently increased property values, Plaintiffs allege that Ginn used its subsidiary GTS (and its predecessors) to falsely record property transactions to bolster fraudulent valuations of Ginn properties.  Specifically, they contend that Ginn would sell multiple properties to an insider, and then GTS would record the total purchase price as the price for each property, or it would record the entire purchase price on a single property and record a price of $1 on the other.  According to the TAC, those properties recorded with falsely high purchase prices were then used as comparables in the appraisals of other properties and were included in lists of properties sold to support the non-negotiable prices listed by Ginn.  Plaintiffs identify seven examples of this practice

19

in the Conservatory, Bella Collina, and Reunion developments. But none of those examples is an instance in which a false sales price was shown or communicated to named Plaintiffs.

Plaintiffs also contend that one sale, that of Bella Collina Lot 194, was recorded and used in appraisals before the sale was actually completed. Of the appraisals alleged to prematurely use Lot 194 as a comparable, only one relates to a Plaintiff's purchase: Miller's purchase of Lot 110. But that allegation does not help Plaintiffs to make their claim because Plaintiffs have not averred that the prematurely recorded value for Lot 194 was in any way inaccurate or that it had any material impact on the appraisal of Miller's lot.

Finally, Plaintiffs claim that property values were inflated by Defendants' discount sales to "insiders," who would then immediately or soon thereafter flip the properties they purchased for significant profit. Only one of these "flipped" properties belonged to a Plaintiff: the Billingtons' purchase of Bella Collina Lot 331. Plaintiffs do not explain how the discounts or "flipping" constitutes fraud.

## IV.

Despite Plaintiffs' unwieldy, everything-but-the-kitchen-sink approach to pleading, we agree with the district court: Plaintiffs have failed to satisfy the particularity requirements of Rule 9(b). Because this deficiency alone dooms

Plaintiffs' case, we affirm the district court's dismissal of the TAC with prejudice without reaching the parties' other arguments.[6]

Plaintiffs premised their RICO claims on mail and wire fraud, so they were required to satisfy Rule 9(b).  *Am. Dental Ass'n*, 605 F.3d at 1291.  In other words, with respect to Ginn, GTS, and Lubert-Adler, the Plaintiffs had to have alleged the following: "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud."  *Id.* (quoting *Brooks*, 116 F.3d at 1380-81) (quotation marks omitted).  They did not do so.

For starters, Plaintiffs did not assert the fair market values of any of their lots at the time of purchase.  Without this essential fact, Plaintiffs have failed to establish anything more than a conclusory allegation that Defendants "lied."  Rule 9(b) requires more than an allegation that a misrepresentation was made; it requires a plaintiff to identify with precision what the misrepresentation actually was.

But even if such an allegation were sufficient, most allegations of fraud in the TAC—such as falsely "vouching" for the fair market value of properties known to be worth less or preparing deficient appraisals—are attributed to bank

---

[6] For example, we do not consider whether Plaintiffs have plausibly pled proximate causation under RICO.  Nor do we opine on whether the magistrate judge correctly applied and rejected a fraud-on-the-market theory of causation or inflated-purchase-price theory of damages.

employees, not to any of the three Defendants remaining in this case. And to the extent Plaintiffs ever specifically identify any of the Ginn salespeople with whom they spoke, they fail to adequately plead what the salespeople said beyond "vouching" for prices. They likewise do not identify when the salespeople made these alleged misrepresentations. Nor do Plaintiffs offer any specifics on how Ginn instructed or otherwise controlled the appraisals tied to Plaintiffs' particular lots.

As for Defendant GTS, Plaintiffs do not allege how any of the fraudulently recorded sales misled them with respect to any of their actual purchases. And regarding Lubert-Adler, beyond general allegations that Lubert-Adler "exercised absolute control over" the developments, Plaintiffs offer no specifics of any misconduct on the part of Lubert-Adler tied to their purchases.

Although Plaintiffs invite us to read the TAC "as a whole," Rule 9(b) does not permit us to assemble the TAC's impressive collection of disparate and disjointed facts into a collage of fraud. Rule 9(b) demands that Plaintiffs must actually plead the who, what, when, where, and how of specific misrepresentations that led them astray. Absent the required specificity, Plaintiffs' RICO claim must be dismissed. This lack of specificity similarly condemns Plaintiffs' conspiracy claims, which are ultimately premised on the same fraudulent conduct and

therefore demand the same level of detail in pleading.   For these reasons, the district court's dismissal of Plaintiffs' claims with prejudice[7] is **AFFIRMED**.

---

[7] Plaintiffs have not suggested that dismissal with prejudice was improper if dismissal is warranted, and we agree that Plaintiffs do not have a right to a *fifth* chance to adequately state a claim.